# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| **PERRY FUNK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BWX TECHNOLOGIES, INC.** ) | **Case No.:   6:16-CV-53-NKM** |
| ) | |
| **and** ) | |
| ) | |
| **BWXT-NUCLEAR OPERATIONS** ) | |
| **GROUP, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendants, BWX Technologies, Inc. ("BWXT"), and BWXT-Nuclear Operations

Group, Inc. ("BWXT-NOG") (collectively "defendants"), by counsel, in accordance with Rule

56 of the Federal Rules of Civil Procedure, hereby move for entry of summary judgment in their

favor as to all claims asserted by plaintiff, Perry Funk ("Funk" or "Plaintiff").

### I.      Preliminary Statement

This is a same-sex harassment case that has no proof of harassment "because of

[Plaintiff's] sex" and a Plaintiff who has suffered no adverse employment action and has no out-

of-pocket losses.  While Mr. Funk and a co-worker, Terry Trent, about whom Mr. Funk later

complained, both engaged in inappropriate workplace behavior that at times was sexual in

nature, Mr. Funk admits that his co-worker is not homosexual and there is *no* proof that any

actions about which he belatedly complained were *because of his sex*, as is required to establish a

Title VII same-sex harassment claim.  The complete absence of proof on the essential "because

WOODS ROGERS PLC
ATTORNEYS AT LAW

of sex" element dooms his same-sex harassment claim to failure. As discovery has shown, Plaintiff actively participated in the conduct he now improperly characterizes as unlawful sex harassment, he never reported it pursuant to the applicable harassment policy, and, once an appropriate report was made on Plaintiff's behalf that Plaintiff was allegedly uncomfortable, Plaintiff admits that his problems were resolved to his complete satisfaction. Plaintiff further admitted away his retaliation claims in his deposition and he remains employed with Defendant BWXT-NOG in a higher position and at a higher rate of pay than when the alleged conduct occurred. Accordingly, Defendants respectfully request that the Court grant their Motion for Summary Judgment.

## II. Statement of Undisputed Facts[1]

1. Perry Funk is presently employed with Defendant BWXT-NOG and has not experienced an adverse employment action related to the allegations in this suit

Plaintiff Perry Funk has worked for BWXT-NOG or one of its predecessor entities since September, 1998. (Funk tr. 70). Mr. Funk's pay and employment classification has generally increased since his date of hire, aside from an incident early in his career when he left sensitive material unattended and was moved from a level 11 position to a level 1 janitorial position. (Funk tr. 32, 101). The record reflects that Mr. Funk is generally a good worker (Kesler tr. 72), though he has had problems with anger management and interactions with other employees from time to time. (Kesler tr. 30–32). For instance, Mr. Funk would become so upset that he was "purple and shaking" if other employees moved his gloves. (Kesler tr. 31–32).

[1] Relevant portions of party or witness deposition transcripts are attached as follows: Perry Funk as **Exhibit A**, Terry Trent as **Exhibit B**, Janice Lewis as **Exhibit C**, Jerome Kessler as **Exhibit D**, Christopher Brummett as **Exhibit E**, Threasa Ferguson as **Exhibit F**, Gregory Hamlett as **Exhibit G**, Thomas Phillips as **Exhibit H**, Stacy Angel as **Exhibit I**, Burton (Joel) Burch as **Exhibit J**, William Lemon as **Exhibit K**, Kimberly Spraker as **Exhibit L**, Wayne Massie as **Exhibit M**, Jarrett Dodd, M.D. as **Exhibit N**, Defendants' 30(b)(6) designee as **Exhibit O**, Jennifer Keller as **Exhibit DD** and Susan Owen as **Exhibit EE**.

Woods Rogers PLC
ATTORNEYS AT LAW

{2319712-6, 116882-00002-01}

2

In 2001, Mr. Funk received a promotion out of the janitorial workforce to take a position as a Filler Facility Helper. (Funk tr. 122–23). His supervisor in that position was Front Line Manager Jerome Kesler (Funk tr. 127), who was also Mr. Funk's supervisor during the period in which Mr. Funk alleges he was unlawfully harassed because of his sex. (Comp. ¶ 22). In his deposition, Mr. Funk testified that Mr. Kesler was an "excellent" supervisor (Funk tr. 133) and that the two of them played games with each other and "carried on a little bit," because they "spent more time in there with them than we did our own family." (Funk tr. 131–32). The "carrying on" included playful physical contact, but Mr. Funk did not find it offensive in any way. (Funk tr. 133). During his time as a Facility Helper, if Mr. Funk reported an issue to Mr. Kesler, it was "immediately" addressed and Mr. Funk testified that there was not a single incident that Mr. Kesler handled inappropriately. (Funk tr. pp. 134–35).

In January, 2011, Mr. Funk applied for and received a new position in the "K-Building" as a Wrought Material Coupon Coordinator and received a corresponding pay increase. (Funk tr. 143). Mr. Kesler was instrumental in convincing Mr. Funk to apply for this position. (Funk tr. 135–36). Mr. Funk's transfer was controversial because other employees at higher-level positions felt as though Mr. Kesler was "playing favoritism" toward Mr. Funk. (Funk tr. 137). Mr. Kesler continued to supervise Mr. Funk in the K-Building as the Front Line Manager, but because the K-Building is remote Mr. Kesler saw Mr. Funk on a weekly basis instead of daily. (Kesler tr. 49–50). The only employees who were permanently stationed in the K-Building at the time were Mr. Funk, Terry Trent and Janice Lewis. (Ferguson. tr. 97).

Although Plaintiff characterizes Mr. Trent as a supervisor in his Complaint, Plaintiff's own testimony and the indisputable testimony of others refute that characterization. In his deposition, Plaintiff flatly admitted that Mr. Trent was "not a supervisor," was an hourly

Woods Rogers PLC
ATTORNEYS AT LAW

employee, did not conduct performance evaluations, did not have the authority to affect Mr. Funk's rate of pay, could not issue discipline, and was not involved in promotion or termination decisions. (Funk tr. 163–64). Other witnesses confirmed unequivocally that Mr. Trent was not a supervisor. (Ferguson tr. 37–39; Lemon tr. 27–28; Massie tr. 11–12; Lewis tr. 25; Trent tr. 47–48). Mr. Trent's job level was identical to Plaintiff's, though his pay was slightly higher as his was a more "senior" position. (Funk tr. 165).

Mr. Funk is currently employed as a Senior Material Control Inventory Technician in the K-Building. (Funk tr. 144). He was promoted to this position due to Mr. Trent's termination from BWXT-NOG. (Funk tr. 144). Mr. Trent was terminated as a result of Defendants' investigation of allegations of procedural misconduct and inappropriate workplace behavior that Mr. Funk lodged against Mr. Trent with BWXT-NOG management. During the time period in which Mr. Funk claims to have suffered sexual harassment and retaliation, Mr. Funk's hourly rate of pay increased from $25.19 per hour to $29.71 per hour. (Funk tr. 147–49).

> 2. Funk makes a complaint to management about many issues, with "harassment" as an afterthought

On May 18, 2015, while working in his position as Wrought Material Coupon Coordinator in the K-Building, Mr. Funk got into a dispute with his K-building co-worker Janice Lewis. Ms. Lewis preferred the air conditioning in the K-Building warmer than Mr. Funk preferred. As Mr. Funk stated, "she stays so cold. She had cancer," and he believed that by warming the area up, Ms. Lewis was being "hateful" toward him. (Funk tr. 284; Ferguson Decl. Ex. 2. at 510). Ms. Lewis's attempts to make the work area warmer infuriated Mr. Funk, and he complained to Mr. Kesler. (Funk tr. 255, 259). Mr. Funk was so upset with Ms. Lewis that he prayed that she'd be in a car wreck so he would not have to work with her anymore. (Funk tr. 261).

Woods Rogers PLC
ATTORNEYS AT LAW

Mr. Funk was unequivocal that the air conditioning dispute is what led him to complain to his supervisor:

> Q: [U]ltimately Janice Lewis was what caused you to go complain to Jerome Kesler, right?
>
> A: Yeah.
>
> . . .
>
> Q: [T]he first thing that you told him about—him, Jerome Kesler, when you went to complain to him—was about the air condition issue with Janice Lewis, right?
>
> A: Correct.  (Funk tr. 255, 259).

Mr. Funk also complained that Ms. Lewis was not following operating procedures, arguing that Ms. Lewis completed her work too quickly for it to have been done correctly and failed to follow protocol for her computer use.  (Funk tr. 256, 291).  Mr. Funk — who incorrectly claims to be functionally illiterate with computers and therefore unable to access his employer's harassment policies (*see*, *e.g.*, Funk tr. 116) — nonetheless would follow shut-down procedures to "cut [her computer] off for her so she wouldn't get in trouble."  (Funk tr. 291).

Mr. Funk's issues with Ms. Lewis that drove him to complain to his supervisor had nothing to do with sexual harassment.  As Mr. Funk admitted in his deposition, "[Janice Lewis] never sexually harassed me whatsoever."  (Funk tr. 285).  Upon receiving Mr. Funk's complaints, Mr. Kesler elevated the issue to Kim Spraker, the Unit Manager over Mr. Kesler, Mr. Funk and Ms. Lewis.  (Funk tr. 288; Ferguson tr. 41).  Mr. Kesler asked if Mr. Funk preferred to go directly to Bill Lemon, the Section Manager, but Mr. Funk declined.  (Funk tr. 288).  Mr. Funk repeated his complaints to Ms. Spraker, which, as she recalled them were "something about the temperature in the building" and Ms. Lewis and another co-worker, Terry

WOODS ROGERS PLC
ATTORNEYS AT LAW

Trent "not following procedures."  (Spraker tr. 13–14).  Ms. Spraker then elevated the issue to Bill Lemon.  (Spraker tr. 14).

Ms. Spraker, Mr. Kesler and Mr. Funk went into Mr. Lemon's office, where "Perry was very upset.  He was bright red, and he was shaking."  (Spraker tr. 15–16).  Mr. Lemon decided to consult Human Resources and Threasa Ferguson, an HR Generalist, joined the meeting.  (Lemon tr. 34).  Ms. Ferguson reported that Mr. Funk "was extremely upset.  He was red in the face, sweating profusely, crying at one point.  On several times he was crying."  (Ferguson tr. 47).  Again, Mr. Funk complained about Ms. Lewis turning the temperature up and not following procedures.  (Funk tr. 290–91).  It was not until after he complained about air conditioning and procedural issues that he mentioned anything regarding Mr. Trent:

> Q: So after you'd talked about the air conditioning and about the operating procedures with Janice, then you said something about Terry Trent and what you thought he'd been doing?
>
> A: Yes, sir.
>
> Q: And you said he plays around too much?
>
> A: Yes, sir.  But I said he played around too much sexually.  (Funk tr. 293–94).

The only instances of alleged harassment that Mr. Funk recalls reporting at this meeting was that Mr. Trent allegedly opened his fly and that Mr. Trent had pulled *up* Mr. Funk's underwear, which Mr. Trent disputes.  (Funk tr. 294).

Although Mr. Funk alleges otherwise, Mr. Kesler testified that prior to May 18, 2015, Mr. Funk never reported any instance of sexual harassment to him.  (Kesler tr. 29).  While Mr. Funk accuses Mr. Kesler of failing to take action to correct Mr. Trent's alleged behavior, the evidence is undisputed that Mr. Funk never pursued any of the reporting options under Defendants' harassment policy prior to his May 18, 2015 Complaint.  (Funk tr. 222–23).

Woods Rogers PLC
ATTORNEYS AT LAW

3. **When Plaintiff was hired, he received copies of Defendants' relevant policies and they remained available to him throughout his employment**

When Plaintiff was first hired with BWXT-NOG's predecessors, he received comprehensive information regarding Defendants' sex harassment policies and work rules.[2] The harassment policy in effect at the time of the alleged harassment in this case had a detailed reporting structure. The harassment policy directed employees to report perceived harassment to: (1) the local EEO representative; (2) Human Resources; (3) Ethics & Compliance; (4) the Legal Department; (5) the Vice President; or (6) the Chief Compliance Officer. (Ferguson Decl. Ex. 1 at 625). Defendants' Code of Business conduct also informed employees that they could make reports for any policy violations to: (1) an anonymous hotline; (2) an email address (ethics@bwxt.com); (3) a compliance website (ethics.bwxt.com); and (4) by letter marked "confidential" to a P.O Box for BWXT Ethics and Compliance. (Ferguson Decl. Ex. 1 at 632) Notably, an employee's direct supervisor (in Plaintiff's case, Mr. Kesler) is *not* listed as a reporting option under Defendants' harassment policy. (Ferguson Decl. Ex. 1. at 625).

In addition to acknowledging receipt of Defendants' policies at the time of his hire, Plaintiff testified that he was aware he could obtain copies of the harassment policy from HR or elsewhere:

> Q: And if you had wanted to see [the harassment policy], you could go to Human Resources or elsewhere in the company to get a copy of it, right?
>
> A: I'm sure you could. (Funk tr. 358–59).

---

[2] Copies of relevant policies are attached as Exhibit 1 to the Declaration of Threasa Ferguson, which is attached hereto as **Exhibit P**. BWXT, BWXT-NOG and/or their predecessor companies had equal opportunity and/or sexual harassment policies in place for decades. (Feguson Decl. ¶ 3, Ex. 1; Declaration of Stacey Angel ¶¶ 3, 4; Declaration of Christopher Brummett ¶ 3; Declaration of Burton Burch ¶ 3; Declaration of Gregory Hamlett ¶ 3; Declaration of William Lemon ¶ 3; Declaration of Andrew Shaddock ¶ 3; Declaration of Kimberly Spraker ¶ 10; Declaration of Terry Trent ¶ 3). The declarations are attached as follows: Ms. Angel as **Exhibit Q**, Mr. Brummett as **Exhibit R**, Mr. Burch as **Exhibit S**, Mr. Hamlett as **Exhibit T**, Mr. Lemon as **Exhibit U**, Mr. Shaddock as **Exhibit V**, Ms. Spraker as **Exhibit W** and Mr. Trent as **Exhibit X**. Acknowledgements of Mr. Funk's receipt of policies are attached as **Exhibit Y** and he testified that he knew he could get copies of the policies at any time if he wanted. (Funk tr. 358–59; 361)**.**

{2319712-6, 116882-00002-01}

7

WOODS ROGERS PLC
ATTORNEYS AT LAW

Indeed, copies of Defendants' policies were available to all BWXT-NOG employees through BWXT-NOG's Intranet (Angel tr. 46), and a copy of the harassment policy is posted (and was posted during the relevant time period) on a bulletin board at the facility's entrance. (Angel tr. 50). Mr. Funk does not deny that the policy was available to him:

> Q: Okay. So you knew where to go to find [the harassment policy] if you wanted to look at it?
>
> A: If you knew how to get to it, yeah.
>
> Q: Or you could – and if you didn't, you could certainly have somebody help you with that—
>
> A: Oh, yeah.
>
> Q: --right?
>
> A: Yes, sir. (Funk tr. 361).

In his deposition, Plaintiff testified that prior to May 18, 2015 — despite all of the available reporting options — he had never reported any issues with harassment to any employee or representative of Defendants aside from (allegedly) Mr. Kesler (which Mr. Kesler denies):

> Q: You could have gone to Kim Spraker, your unit manager. You could have gone to the section manager, Bill Lemon. You could have gone to HR. You could have gone to the ethics—compliance officer. You could have gone to the general manager
>      You could have used the 800 line. You knew there was an 800 line you could call, right? You knew there was an email process you could use if you wanted to complain. You could have gone through any of those, right, if you'd had a problem that you thought was not being addressed. Is that correct?
>
> A: That is correct.
>
> . . .
>
> Q: And before May 18, 2015, you had never complained to any supervisor or manager in B&W, BWX, outside of your front-line manager?

WOODS ROGERS PLC
ATTORNEYS AT LAW

A: No, sir. I clock out and go home. (Funk tr. 219–23).

Plaintiff has never been shy about promptly reporting incidents that really do bother him. For example, he sent a *plant wide email accusing the General Manager* of the Lynchburg facility of a hard hat safety violation. (Burch tr. 46–48). In fact, the General Manager explained that Mr. Funk was wrong about the violation, but nonetheless he personally called Mr. Funk and thanked him for trying to look after his safety. (Burch tr. 46–48).

### 4. Defendants immediately launch a comprehensive investigation

Despite the passive, offhand nature of Mr. Funk's alleged report of sexual harassment, the Ethics and Compliance office of Defendant BWXT immediately launched an investigation.[3] The *day of* Mr. Funk's complaint, BWXT-NOG involved Mr. Funk's Unit Manager, Section Manager, and BWXT's Human Resources Office. (Ferguson Decl. Ex. 2 at 510) The *next day*, May 19, 2015, BWXT's Ethics and Compliance Office, through Drew Shaddock, BWXT's Director of Ethics and Compliance, along with Ms. Ferguson, interviewed Mr. Trent, Ms. Lewis, Mr. Funk, Mr. Kesler and Ms. Spraker. (Ferguson Decl. Ex. 2 at 536). The day after, May 20, Mr. Shaddock and Ms. Ferguson interviewed Mike Bryant and Chris Brummett, more of Mr. Funk's co-workers, and interviewed Mr. Kesler and Mr. Funk again. (Ferguson Decl. Ex. 2 at 536). While the investigation was taking place, Mr. Kesler, Mr. Trent and Ms. Lewis were sent home (Ferguson Decl. Ex. 2 at 536–37) whereas Plaintiff was not sent home and retained his same rate of pay. (Funk tr. 312).

On May 29, Ms. Ferguson summarized the results of Defendants' investigation and prepared written recommendations for employment actions with respect to Mr. Trent, Ms. Lewis, Mr. Kesler and Mr. Funk. (Ferguson Decl. Ex. 2 at 536–37). With respect to Ms. Lewis,

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[3] Relevant copies of investigation notes are attached as Exhibit 2 to Threasa Ferguson's declaration and referenced by individual bates numbers

Defendants' investigation revealed that she knowingly failed to follow correct operating procedures which was a violation of Work Rule 18, willful violation of Company policies and/or gross negligence of duties. (Ferguson Decl. Ex. 2 at 536; Ferguson Decl. Ex. 1 at 595). She was also found to have used foul language and shown disrespect to Mr. Funk, which was a violation of Work Rule 19. (Ferguson Decl. Ex. 2 at 536; Ferguson Decl. Ex. 1 at 595). No formal recommendation was made for disciplinary action against Ms. Lewis because she retired during the pendency of the investigation (Ferguson Decl. Ex. 2 at 536); however, Ms. Ferguson testified that the recommendation would have been to terminate her employment had she not retired. (Ferguson tr. 70).

Terry Trent was likewise found to have violated Work Rules 18 and 19, the former by failing to follow correct workplace procedure and the latter for his use of foul language and inappropriate remarks, gestures and actions. (Ferguson Decl. Ex. 2 at 536; Ferguson Decl. Ex. 1 at 595). The recommended action for Mr. Trent was termination. (Ferguson Decl. Ex. 2 at 536).

Similarly, Plaintiff was found — via his own admission — to have routinely used foul, sexually explicit language, much of it at Mr. Trent's expense, such as calling him queer, gay and bitch while also calling Mr. Trent the nickname "Sherry." (Ferguson Decl. Ex. 2 at 537; Funk tr. 199). As with Mr. Trent, this language was found to violate Work Rule 19. (Ferguson Decl. Ex. 2 at 537; Ferguson Decl. Ex. 1 at 595). Witnesses also reported that Plaintiff threatened to kill Chris Brummett, who was another BWXT-NOG employee who occasionally helped in the K-Building. (Brummett tr. 22–23; Trent tr. 72). Likewise, Mr. Trent and Ms. Lewis testified that Mr. Funk threatened to kill Mr. Trent. (Trent tr. 74; Lewis tr. 58). It was recommended that Mr. Funk be made aware that his use of sexually explicit, obscene and threatening language would not be tolerated and he in fact was issued a written warning conveying that reprimand.

WOODS ROGERS PLC
ATTORNEYS AT LAW

(Ferguson Decl. Ex. 2 at 537; Funk tr. 199).  It was further recommended that Mr. Funk be referred to Defendants' Employee Assistance Program ("EAP") to help him better manage his emotions.  (Ferguson Decl. Ex. 2 at 243, 537).

Mr. Kesler was found to have violated Work Rules 18 and 11, the former due to the fact that his subordinates' policy violations occurred on his watch and the latter due to Defendants' determinations that Mr. Kesler made false statements during their investigations.  (Ferguson Decl. Ex. 2 at 537; Ferguson Decl. Ex. 1 at 595).  Two options were recommended for Mr. Kesler: (1) demotion; or (2) termination.

The recommendations were conveyed to Plant Manager Joel Burch, who agreed with the proposed courses of action for each employee and elected to terminate Mr. Kesler's employment in lieu of demotion.  (Burch tr. 22–24).  Mr. Burch made his decisions in consultation with BWXT's in-house legal department, Human Resources, Ethics and Compliance, as well as the individual employees' management team.  (Burch tr. 23–24).

When asked to explain why Mr. Trent and Mr. Funk received different disciplines, Mr. Burch testified that Mr. Trent's termination was "primarily due to him not following procedures exactly correct."  (Burch tr. 24).  Mr. Burch explained that "I think both of them kind of harassed each other a little bit with – with their language and their statements and the way they were carrying on, but I found no evidence that – none of the facts said that Mr. Funk was not following procedures. . . ."  (Burch tr. 27).  Ms. Ferguson echoed Mr. Burch's explanation in her deposition.  She explained that the distinction between the discipline (termination of employment) that Mr. Trent, Ms. Lewis and Mr. Kesler received (or would have received in the case of Ms. Lewis) and the warning that Mr. Funk received was due to the fact that, in addition

WOODS ROGERS PLC
ATTORNEYS AT LAW

to the inappropriate workplace behavior in which Mr. Funk actively participated, the three others committed or tolerated operating procedure violations. (Ferguson tr. 140–41).

In the end, Mr. Funk testified that as soon as he "had enough of it," an appropriate and fair investigation occurred and he suffered no financial loss:

> Q: And you worked the whole time during the investigation, right?
>
> A: Yes, sir.
>
> Q: Okay. You didn't lose any money or anything as a result of that?
>
> A: No, sir.
>
> ...
>
> Q: And is it fair to say that as soon as this – the issues you raised were brought to the attention of someone above Jerome Kesler, an investigation occurred that you think was appropriate. Is that fair?
>
> A: Yes, sir. That's fair. (Funk tr. 312–13).

As Mr. Funk testified succinctly, "***When I had enough of it, yes. It was dealt with.***" (Funk tr. 372) (emphasis added).

> 5. There is no dispute that both Mr. Trent and Mr. Funk are heterosexual and that <u>Mr. Funk actively participated in the conduct at issue</u>

When discussing whether Mr. Trent was homosexual or heterosexual, Plaintiff admitted he did not know what those words meant. (Funk tr. 252). Using his own vernacular, Plaintiff plainly testified, however, that Mr. Trent "wasn't a queer." (Funk tr. 250). Plaintiff testified that he, too, is "not homo." (Funk tr. 252). Mr. Trent, who like Mr. Funk is married, likewise testified that he is not homosexual or bisexual. (Trent tr. 63). While Plaintiff complained that Mr. Trent would say "I love you" to Plaintiff, when asked if he thought Mr. Trent actually loved him, Plaintiff replied "I thought he was stupid." (Funk tr. 249). Ms. Ferguson testified that nothing in her investigation led her to believe that Mr. Funk thought Mr. Trent was a homosexual

WOODS ROGERS PLC
ATTORNEYS AT LAW

(Ferguson tr. 115); and Ms. Lewis testified that Mr. Trent never referred to himself as being gay, nor did she have reason to believe he was homosexual. (Lewis tr. 76, 63). Other witnesses likewise did not see any indication that Mr. Trent was homosexual. (Ferguson Decl. ¶ 8; Angel Decl. ¶ 6; Brummett Decl. ¶ 6; Burch Decl. ¶ 8; Hamlett Decl. ¶ 8; Lemon Decl. ¶ 8; Shaddock Decl. ¶ 7; Spraker Decl. ¶ 9; Trent Decl. ¶ 10).

In reality, Mr. Funk and Mr. Trent simply played around using inappropriate sexual comments in the workplace. Even Plaintiff's primary care physician, Dr. Dodd — who treated Plaintiff for his alleged emotional issues — did not think the conduct was sexual in nature:

> Q: So did [Plaintiff] mention I guess explicitly that this was, in his view, homosexual sexual harassment?
>
> A: I don't – I don't remember if it was that. ***It just sounded like guys being stupid.*** (Dodd tr. 32) (emphasis added).

Indeed, Plaintiff never mentioned workplace harassment to his primary care physician at all until *after* May 18, 2015, despite Dr. Dodd's longstanding treatment of Plaintiff for anxiety and other issues. (Dodd tr. 18). Mr. Brummett said that until Mr. Trent and Ms. Lewis were terminated, the K-Building employees behavior was "[l]ots of laughing, joking, playing around, goofing off." (Brummett tr. 14). As he characterized the interactions between himself, Ms. Lewis, Mr. Funk and Mr. Trent, "Everything was fine in the K-Building until it wasn't."[4] (Brummett Decl. ¶ 8).

In addition to the sexual names Plaintiff called Mr. Trent, Mr. Funk's coworkers described how he would often inject sexual issues in other, sometimes disturbing ways. For instance, Ms. Lewis would bring in the newspaper every morning and Mr. Trent described how

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[4] Mr. Funk's sudden change in attitude may have been related to his repeated desire to get rich quick through filing a lawsuit against his employer, something he stated to his co-workers on multiple occasions before initiating this suit or taking issue with Mr. Trent or Ms. Lewis's behavior. (Trent Decl. ¶ 11; Brummett Decl. ¶ 10).

Plaintiff would "look at these young girls" in the paper and talk about "how pretty they were and how he'd like to train them." (Trent tr. 55–56). Mr. Trent stated he would respond to Plaintiff that "these are little young girls, and that's kind of sick and perverted." (Trent tr. 57). Corroborating Mr. Trent's testimony on this issue is the fact that Mr. Funk was convicted of contributing to the delinquency of a minor in violation of Va. Code § 18.2-371, due to the fact that Mr. Funk had a sexual relationship with his wife's minor niece who was residing in his care. Mr. Funk in fact fathered a child with this minor through this inappropriate relationship.[5] (Funk tr. 411).

Plaintiff's co-workers testified that Mr. Funk would boast to Mr. Trent and Mr. Brummett in explicit detail about sexual encounters he had with women, such as using a banana as a phallic object in sexual encounters and then eating it as a "banana split," or publicly performing oral sex on a woman on a hotel balcony, or having sex with his wife while she was menstruating. (Trent tr. 57–59; Brummett Decl. ¶ 6). Plaintiff also admitted that he "twisted [Mr. Trent's] tit" while calling him a "stupid bitch" (Funk tr. 304–05, 377). Mr. Brummett testified that Plaintiff told him and Mr. Trent that Plaintiff "had a bunch of Indian in him" and would "prove it" by pulling his shirt up to show he had no body hair, but then Plaintiff would expose his pubic area to show he had "hair down here." (Brummett tr. 25). Tommy Phillips stated in his deposition that Plaintiff would sing a song to him on a "daily" basis with the refrain, "Go see Lucy. She give me some pussy, and she take my two pesos away." (Phillips tr. 26–27).

6. Plaintiff alleges that his new K-Building co-workers harass him and that he was retaliated against, but in his deposition he effectively negated those allegations

The remaining allegations in Plaintiff's Complaint concern subsequent incidents in which: (1) Plaintiff claimed that the two K-Building employees who came to the building after

---

[5] Supporting documentation is attached as **Exhibit Z**.

WOODS ROGERS PLC
ATTORNEYS AT LAW

Mr. Trent and Ms. Lewis were terminated sexually harassed him; (2) Plaintiff's car was twice "booted" for being improperly parked in a handicapped space, which Mr. Funk claims was retaliation; (3) Plaintiff was required to undergo a security review; (4) unidentified individuals allegedly retaliated against Plaintiff by calling him names such as "rat" and "snitch"; and (5) Plaintiff was referred to the EAP. (Compl. ¶¶ 40–42; 45–47; 57–61).

Plaintiff alleged in his Complaint that two other co-workers harassed him in two separate instances. BWXT-NOG accounted for the departures of Mr. Trent and Ms. Lewis by temporarily transferring Tommy Phillips and Greg Hamlett (an engineer) to the K-Building. In the first instance, Plaintiff alleged that Mr. Phillips put a corn dog on his crotch and said "bite this" to Plaintiff. (Compl. ¶ 57). In the second instance, Plaintiff alleges that Greg Hamlett emerged from the K-Building bathroom with his penis exposed to Plaintiff's view. (Compl. ¶ 59). Regarding the "corn dog incident," all parties agree that Plaintiff's, Mr. Phillips' and Mr. Hamlett's interactions on that occasion were a result of Mr. Funk's well-known aversion to eating after other people. (Funk tr. 279). Mr. Phillips and Mr. Hamlett deny vehemently there was any sexual aspect to the events. (Phillips tr. 34; Hamlett tr. 28). Regardless, Plaintiff in fact took a bite of Mr. Hamlett's corn dog and all parties shared a laugh. (Funk tr. 279). In his deposition, Mr. Funk admitted he did not think Mr. Phillips or Mr. Hamlett were trying to sexually harass him by the "corndog incident." (Funk tr. 281–82). Mr. Funk admits that he did not say anything to Mr. Phillips or Mr. Hamlett about this alleged incident at the time it occurred. (Funk tr. 281).

With respect to the bathroom incident, and consistent with the other forms of horseplay Mr. Funk had participated in with Mr. Trent, Mr. Funk, Mr. Hamlett and Mr. Phillips played a game where one would loudly knock on the K-Building bathroom door which made a very loud

WOODS ROGERS PLC
ATTORNEYS AT LAW

noise in the small bathroom and startled the occupant. (Funk tr. 265). Mr. Funk actively participated in this game. (Funk tr. 265). The incident at issue occurred when Mr. Hamlett was in the stall and Mr. Funk banged so loudly on the door that Mr. Hamlett believed that something was wrong and he pulled the door open quickly while simultaneously trying to pull up his pants. (Hamlett tr. 22). Mr. Hamlett acknowledged that he may not have completely gathered himself before opening the door. (Hamlett tr. 22).

Though the version of events among Plaintiff, Mr. Hamlett and Mr. Phillips vary to some degree, Mr. Funk negated both episodes in his deposition. Plaintiff testified that he felt like, rather than harassing him, Mr. Hamlett and Mr. Phillips were "trying to get me to loosen up," (Funk tr. 282), that they were trying to teach him to relax, which Mr. Funk thought was "great advice" (Funk tr. 279), and Mr. Funk believes that neither Mr. Hamlett nor Mr. Phillips intended any harm. (Funk tr. 275). There is *no* evidence that either Mr. Phillips or Mr. Hamlett is homosexual or that the two incidents somehow were done "because of [Plaintiff's] sex." Mr. Funk described Greg Hamlett as an "honest, good person, Marine, loved his family. He cared for me." (Funk tr. 278). Plaintiff told his wife that Mr. Hamlett and Mr. Phillips were trying to help him (Funk tr. 282), and he testified that there was no harmful or retaliatory intent:

> Q: So you didn't think they were doing anything to be mean to you?
>
> A: No, sir.
>
> Q: They weren't trying to retaliate against you or anything like that?
>
> A: No, sir.
>
> Q: It was just jokes that were being done?
>
> A: Yes, sir. (Funk tr. 266).

WOODS ROGERS PLC
ATTORNEYS AT LAW

Most critically, Plaintiff admitted that he *did not report either incident to either Defendant in any way*. (Funk tr. 274, 282). The alleged incidents occurred between June and October, 2015, and the first time a defendant was made aware of these alleged incidents was *after* Plaintiff filed a charge of discrimination with the EEOC on or around February 20, 2016. (Funk tr. 188).

In his deposition, Mr. Funk effectively disclaimed his retaliation claims. Mr. Funk liked the EAP and has found it to be beneficial. (Funk tr. 271). With respect to his car being booted, Plaintiff admitted that on the first occasion he parked in a handicapped parking space with an expired handicapped tag, and that BWXT security actually did him a *favor* and removed the boot after Plaintiff promised to renew his tag the next day. (Funk tr. 153–57). On the second occasion, Mr. Funk admitted that his car was booted as a result of his own failure to display his handicapped tag correctly: "I forgot to pull it off the sun visor and put it down." (Funk tr. 158). As soon as he displayed his tag properly, security removed the boot. (Funk tr. 158). Despite characterizing these instances as retaliation in his Complaint, Plaintiff ultimately admitted that they were entirely in accordance with policy:

> Q: But in both instances, you understood the company policy. They properly booted you, right? Aside from whether there might have been a reason why you didn't have [your tag]. Is that right? Do you agree with that?
>
> A: I agree with that. (Funk tr. 158–59).

Finally, when asked about the allegations in his Complaint that he has been called names such as "rat" and "snitch" since the investigation into his claims, Mr. Funk could not identify any specific individuals who allegedly spoke those words, saying instead that they came from unnamed "crowds." (Funk tr. 331–32). He also never gave any names or specifics to Defendants such that they could investigate the allegations. (Funk tr. 334). Regarding Plaintiff's

Woods Rogers PLC
Attorneys at Law

allegation that his security clearance was suspended, it was the result of a Government-mandated human reliability program, the review period was quite brief, and ultimately had no effect on Mr. Funk's employment.  (Funk tr. 336–37; Burch tr. 29)  Further, Mr. Funk told his EAP counselor that his security badge was suspended because of the reports that Mr. Funk threatened his co-workers.  (Owen tr. 58)

### III.    <u>Standard of Review</u>

Summary judgment is not "a disfavored procedural shortcut"; it is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).    It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042 (2004) (citations omitted).

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Ferrell v. Great E. Resort Corp.*, 2014 U.S. Dist. LEXIS 159274 at *14 (W.D. Va.  2014) (citing *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248 (1986)).  Where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

WOODS ROGERS PLC
ATTORNEYS AT LAW

showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522. While a court must view the facts and draw "all reasonable inferences in the light most favorable to the non-moving party," the non-moving party must still "set forth specific facts that go beyond the "'mere existence of a scintilla of evidence" and may not rest upon "some metaphysical doubt as to the material facts." *Ferrell*, 2014 U.S. Dist. LEXIS 159274 at *14-15 (citations omitted); *Matsushita*, 475 U.S. at 586.

## IV. <u>Argument</u>

1. Plaintiff's Claims Against BWXT are Unavailable as a Matter of Law, His Claims Against BWXT-NOG are Barred Procedurally, and He Has Waived Any Claims <u>Based on Allegations that Predate the Summer of 2014</u>

Mr. Kesler, Mr. Trent, Mr. Phillips and Mr. Hamlett — each employee against whom Plaintiff has made a sex harassment claim of any specificity — are employees of BWXT-NOG, as is Mr. Funk. (BWXT-NOG Interrogatory Response 9). Mr. Funk has made no allegation of any wrongdoing against any employee of BWXT and has instead admitted that BWXT acted commendably in its response to his claims of harassment and retaliation. (Funk tr. 312–13, 372). There simply is no basis for imputing liability to BWXT even taking Mr. Funk's allegations as true.

In front of the EEOC, however, Mr. Funk elected to proceed solely against BWXT and never named BWXT-NOG as a respondent.[6] In his Charge, Mr. Funk actually requested clarification from BWXT on which entity he should name. (Ex. AA at 773). In its response, BWXT unequivocally informed Mr. Funk that his sole employer and the appropriate party was BWXT-NOG. (Ex. AA at 562). Notwithstanding BWXT's direct response to his question, Plaintiff never amended his charge nor initiated any type of EEOC charge against BWXT-NOG.

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[6] Relevant portions of Mr. Funk's Charge and BWXT's Position Statement are attached as **Exhibit AA** and referenced by individual bates numbers.

Because Plaintiff failed to exhaust his administrative remedies against BWXT-NOG, his claims against that entity are unavailable as a matter of law. "A charge is sufficient 'only if it is 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300, (4th Cir. 2009) (quoting *Chacko v. Patuxent Inst*., 429 F.3d 505, 508 (4th Cir. 2005); 29 C.F.R. § 1601.12(b) (2004)).

Because Plaintiff proceeded before the EEOC against the Defendant (BWXT) with which he has no claim and failed to proceed against the Defendant (BWXT-NOG) that employed Plaintiff and the alleged harassers, Plaintiff's claims against both Defendants are barred.

Additionally, Plaintiff has taken the position in both his Charge of Discrimination with the EEOC and in his Complaint with this Court that the alleged harassment at issue did not predate the summer of 2014. In his Charge, Mr. Funk clearly states that "*[b]eginning* in the summer of 2014 Terry Trent *began* to sexually harass me." (Ex. AA at 773). In his Complaint, Plaintiff alleges that Mr. Trent harassed him "over the course of approximately one (1) year...." (Compl. ¶ 18). Mr. Trent was terminated in early June, 2015 (Ferguson Decl. Ex. 2 at 536) and Plaintiff alleged that Mr. Funk harassed him as late as May, 2015. (Funk tr. 232). In his deposition, however, Mr. Funk took the contrary position that he had issues with Mr. Trent as early as 2011. (Funk tr. 168–69). Because Mr. Funk has taken sworn positions with the EEOC and in his Complaint filed with this Court that establish the onset of alleged harassment as the summer of 2014, any claims based on earlier allegations are unavailable as a matter of law. *See, e.g.*, *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264–66 (4th Cir. 2004) (finding a judicial admission where a statement "has the effect of withdrawing a fact from contention") (quoting *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 477 (5th Cir. 2001)).

Woods Rogers PLC
ATTORNEYS AT LAW

2. Plaintiff's Harassment Claims Against Defendants Fail As A Matter of Law Because, Among Other Reasons, He Cannot Show Any Alleged Harassment Was "Because Of Sex"

To survive summary judgment on a hostile work environment sexual harassment claim, the plaintiff must demonstrate that a reasonable jury could find the harassment (1) unwelcome; (2) *because of sex*; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. 42 U.S.C. § 2000e-2; *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 260 (4th Cir. 2001). In addition, the plaintiff must present "sufficient evidence of a fourth element: that there is some basis for imposing liability" for the harassment on the employer. *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (addressing harassment because of race) (internal quotation marks omitted). In other words, "Title VII is not a strict liability statute." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 636 (7th Cir. 2009); *see also Xerxes Corp.*, 639 F.3d at 670 (under Title VII, "there is no strict liability and an employer must only respond reasonably").

A. None of the alleged harassing behavior was "because of [Mr. Funk's] sex"

i. Conduct that is not "because of [the Plaintiff's] sex" is not actionable under Title VII

Mr. Funk cannot demonstrate that any actions taken by Terry Trent, or others, were "because of sex." *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998); *Lack*, 240 F.3d at 260. In *Oncale*, the United States Supreme Court recognized the availability of a "same-sex" harassment claim under Title VII, but in doing so specifically cautioned that Title VII is not a "general civility code" that protects against "all verbal or physical harassment in the workplace" even when "the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80.

WOODS ROGERS PLC
ATTORNEYS AT LAW

Further, in *Oncale*, the Supreme Court cautioned that in a same-sex harassment case, the court's judgment "requires careful consideration of the social context in which the particular behavior occurs and is experienced by the victim." *Id.* at 81. *Oncale* directed that a court must ensure that it does not "mistake ordinary socializing in the workplace – such as male-on-male horseplay . . . for discriminatory 'conditions of employment.'" *Id.* Reliance on "common sense and an appropriate sensitivity to social context will enable courts and jurors to distinguish between simple teasing or roughhousing among members of the same sex." *Id.* at 82.

The Supreme Court in *Oncale* examined how a plaintiff could demonstrate that alleged harassment occurred "because of sex" in a same-sex harassment context and provided an illustrative list of ways to determine an alleged harasser acted "because of sex." *Id* at 80–81. As set forth in *Oncale* and as summarized by the Fourth Circuit in *Lack*, 240 F.3d at 261–62, and other circuit court decisions, three possible evidentiary avenues exist under *Oncale* to demonstrate that an alleged harasser's conduct was "because of sex." These avenues include 1) whether the alleged harasser is gay or lesbian and/or his or her behavior constitutes "an earnest sexual solicitation"; 2) if the alleged harasser is motivated by a general hostility to the presence of persons of the same sex as the harasser in the workplace; or 3) comparative evidence demonstrates that members of the opposite sex were treated differently by the harasser. *English v. Pohanka of Chantilly, Inc.*, 190 F.Supp.2d 833, 843 (E.D.Va. 2002) (citing *Oncale*, 523 U.S. at 80–81; *Lack*, 240 F.3d at 260–61; *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001)).

There is absolutely *no* evidence that Mr. Trent, Mr. Hamlett, or Mr. Phillips is homosexual or that any of their actions in this case involved "an earnest sexual solicitation." In fact, as Mr. Funk admitted, Mr. Trent "wasn't a queer," (Funk tr. 250), which is confirmed by

WOODS ROGERS PLC
ATTORNEYS AT LAW

Mr. Trent and many other witnesses. (Ferguson Decl. ¶ 8; Angel Decl. ¶ 6; Brummett Decl. ¶ 6; Burch Decl. ¶ 8; Hamlett Decl. ¶ 8; Lemon Decl. ¶ 8; Shaddock Decl. ¶ 7; Spraker Decl. ¶ 9; Trent Decl. ¶ 10). Simply because the words that both Plaintiff and Mr. Trent exchanged were at times sexual in nature, it does not follow that any alleged harassment was "because of sex." As the Supreme Court explained, ***"[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."*** *Oncale*, 523 U.S. at 80 (emphasis added). The general inference of discriminatory harassment is "easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* In same-sex harassment cases, the Supreme Court noted that the same chain of inference would be available "if there were credible evidence that the harasser is homosexual." *Id.* No such inference can be drawn here, by Mr. Funk's own admission and the indisputable evidence. The record is similarly devoid of evidence that Mr. Trent had any type of general hostility to other men in the workplace, nor is there any evidence that he treated women differently than men. When asked if Mr. Trent behaved similarly to Ms. Lewis as he did to Mr. Funk, Plaintiff stated that "[Mr. Trent] would do exactly the same thing to [Ms. Lewis]." (Funk tr. 206–07). Even the notes Mr. Funk wrote[7] regarding Mr. Trent's behavior clearly state that "[Mr. Trent] does this to me/Janice/Chris," and "Terry is all was (sic) saying something about sucking dick or having sex. Even in front of Janice Lewis[.]" (Ex. BB pp. 1, 4) Many of Mr. Funk's complaints concern allegations that Mr. Trent would make sexual comments *about Mr. Funk's wife*, which obviously have nothing to do with Mr. Funk's sex and instead undercuts his same-sex harassment claim. *Id* at 1. Mr. Funk also

---

[7] A transcript of Mr. Funk's notes is attached as **Exhibit BB**

WOODS ROGERS PLC
ATTORNEYS AT LAW

wrote that Mr. Trent would joke that Mr. Funk had sex with his mother-in-law and Janice would

join in and say "[yeah,] that [is] what he done." *Id.* at 8. The abundance of instances where Mr.

Funk details heterosexual jokes involving Mr. Trent and Ms. Lewis as part of his complaints

against Mr. Trent underscore that none of the claims in Mr. Funk's Complaint are "because of

[his] sex."

> ii. Decisions from the Fourth Circuit, Eastern District of Virginia and the Supreme Court of Texas, among others, have dismissed remarkably similar cases (with worse facts) because the alleged behavior was not "because of [the plaintiffs'] sex"[8]

### a. *Alamo Heights Independent School District v. Clark*

In *Alamo Heights Independent School District v. Clark*, 2018 Tex. LEXIS 271 (S.Ct. Tx.

April 6, 2018), the Supreme Court of Texas dismissed Plaintiff's same-sex harassment and

retaliation claims using the *Oncale* framework to conclude that the behavior at issue was not sex-

based harassment. The plaintiff in *Alamo Heights*, Catherine Clark, was employed as a coach

and physical education teacher in the Alamo Heights Independent School District. *Id.* at *4-5.

Clark's time with the School District began well, but in a performance review conducted just

prior to her completing one year of work, Clark's Principal noted friction between Clark and a

female coworker, Ann Monterrubio. *Id.* at *5. Two months later, Clark – much like Mr. Funk in

this case – appeared in the principal's office "unable to communicate effectively due to her

highly charged emotional state" attempting to complain about Monterrubio's behavior. *Id.* at *6.

After missing work for a couple of days, Clark submitted a litany of complaints (ultimately over

100) against Monerrubio extending as far back as the start of the school year. *Id.* at *6. Most of

---

[8] The Fourth Circuit decision addresses harassment "because of sex" under the West Virginia Human Rights Act and the Texas decision addresses harassment "because of [sex]" under the Texas Commission on Human Rights Act, but both courts recognize that the Texas and West Virginia statutes are based on Title VII and both courts relied heavily on federal cases interpreting Title VII, especially *Oncale*, in their analysis. Because of the notable similarities in facts among those cases and the case at bar and because the Fourth Circuit and Supreme Court of Texas engaged in a thoughtful, detailed analysis of controlling federal law governing the exact issue before this Court, Defendants submit that the reasoning of these cases should guide this Court's decision.

WOODS ROGERS PLC
ATTORNEYS AT LAW

the complaints were not sexual in nature, but some detailed vulgar sexual language and sexual connotations. For instance, Clark alleged that Monterrubio made comments about the size of Clark's breasts and buttocks, discussing "how tan" Clark's chest was, seeing Clark's underwear through her pants, and betting with other coaches on whether Clark's breasts were fake. *Id.* at *8 - *9. Clark also alleged that Monterrubio received a candle Clark brought to an office gift exchange and that Monterrubio told Clark "she was going to make love next to the candle when it was lit up in her apartment" while thinking about Clark. *Id.* Clark also stated that Monterrubio remarked that Clark needed to "close her legs" when a student mentioned smelling shrimp that Clark was eating for lunch. *Id.* Monterrubio also allegedly discussed her sex life, showed graphic photos of naked men, and forwarded vulgar emails to groups of people that included Clark. *Id.* at 9. At an office Christmas party, Clark claimed that Monterrubio grabbed Clark's buttocks. *Id.*

Over the next year, the School District attempted to resolve the issues between Clark and Monterrubio in various ways, including transferring Monterrubio, but none was successful. *Id.* at *12 - *17. Indeed, the only time the department ran smoothly was when Clark took FMLA leave. *Id.* at *15. Clark continued to complain and allege that Monterrubio made comments about Clark's breasts and buttocks, told Clark she used Clark's razor to shave her genitals, discussed fellatio with another teacher in front of Clark, and continued discussing her sex life in Clark's presence. *Id.* at *14. And, just like in the present case, Clark also made a litany of other complaints against Monterrubio and other staff members that were not sexual in nature, including unprofessional performance, being excluded from social events, door slamming, being bumped, pushed and having her car attennae removed. *Id.* at *15 - *16.

WOODS ROGERS PLC
ATTORNEYS AT LAW

Clark's work performance suffered throughout this period, and she continued experiencing negative evaluations even after Monterrubio was transferred. *Id.* at *16. Clark was even caught lying about an instance involving a violation of state standardized-testing protocols. *Id.* at *17. Based on her deficient performance, the standardized test issue and her "role in disrupting the department," Clark was terminated for cause. *Id.* She subsequently pursued claims against the School District for sex-harassment and retaliation under the Texas Commission on Human Rights Act ("TCHRA"). *Id.* The School District largely defended the suit by arguing that none of Montirrubio's behavior toward Clark was because of Clark's sex. *Id.* at *18 – *19.

The Supreme Court of Texas relied heavily on the *Oncale* decision in analyzing Clark's claims, noting that the TCHRA was modeled on Title VII. *Id.* at *22. Consistent with *Oncale*, the Texas Supreme Court noted the evidentiary distinction between same-sex and opposite-sex harassment claims:

> Though same-sex and opposite-sex harassment cases are rooted in the same statutory prohibition, evidentiary issues naturally differ. How to prove the harasser's conduct is motivated by gender is more complicated in same-sex cases because the inferences that arise from words and conduct are not necessarily the same when the harasser and victim are the same gender. *Id.* at *23-*24.

The Texas Supreme Court also observed, again consistent with *Oncale*, that "[a]nti-discrimination laws – in their current incarnation – do not guarantee a pleasant working environment devoid of profanity, off-color jokes, teasing, or even bullying." *Id.* at *3.

Following the analytical process mandated by *Oncale*, the Texas Supreme Court first looked to whether there was any evidence of sexual-desire motivation in Monterrubio's conduct. The Court observed that, as with Mr. Funk's suit, the record contained no credible evidence that either Monterrubio or Clark was homosexual. *Id.* at *26. Instead, the Court concluded that

WOODS ROGERS PLC
ATTORNEYS AT LAW

Monterrubio "was a bully who enjoyed getting a rise out of [Clark], and along with her friend Boyer, simply did not like Clark. None of those motives are based on gender." *Id.* at *30. Regarding the instances where Monterrubio touched Clark, including touching Clark's buttocks at the Christmas party, the Court noted that there is a well-established distinction between sexual harassment and sexual horseplay, and only the former is actionable. *Id.* at *32 (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016; *Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 908 (8th Cir. 2010); *McCown v. St. John's Health Sys., Inc.*, 349 F.3d 540 (8th Cir. 2003); *Linville v. Sears, Roebuck & Co.*, 335 F.3d 822 (8th Cir. 2003); *King v. Super Serv., Inc.*, 68 F. App'x 659 (6th Cir. 2003); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833 (E.D. Va. 2002) (further citations omitted). Certain of those cases involved much more egregious conduct than what was at issue in *Alamo Heights* and in the present matter, including genital touching and grabbing, poking a plaintiff's rectum, pinning the plaintiff against the wall and running hands over the plaintiff's body, and grinding genitals on the plaintiff, but nevertheless the claims in these cases were found not to be actionable. *Id.*

The Texas Supreme Court correctly analyzed the law in same-sex harassment cases when it stated, consistent with *Oncale*, and which analysis applies equally herein, that courts must look beyond the sex-specific nature of harassing conduct to the conduct's underlying motivation:

> Regardless of how it might apply in opposite-sex cases, a standard that considers only the sex-specific nature of harassing conduct without regard to motivation is clearly wrong in same-sex cases. The Supreme Court was abundantly clear that gender motivation is not established "merely because the words used have sexual content or connotations." The Court rejected pre-*Oncale* lower-court authority holding "workplace harassment that is sexual in content is always actionable regardless of the harasser's sex, sexual orientation, or motivations." Consistent with *Oncale*, many courts in same-sex cases have recognized that crude, gender-specific vulgarity alone is insufficient to show that harassing behavior is because of gender.

WOODS ROGERS PLC
ATTORNEYS AT LAW

> Furthermore, that a comment relates to a woman's body says nothing about the speaker's motive. The TCHRA is not a strict liability statute that mandates a finding of sex discrimination for any mention of a gender-specific body part. Motivation, informed by context, is the essential inquiry. Why matters. In other words, the bare act of one woman speaking to another woman about her female anatomy does not establish the comments were gender motivated. *Id.* at *41-*42 (citing *Oncale*, 523 U.S. at 79-81; *McCown v. St. John's Health Sys., Inc.*, 349 F.3d 540, 543 (8th Cir. 2003; *Lack*, 240 F.3d at 260-61) (further citations omitted).

The Texas Supreme Court further noted, again consistent with *Oncale*, that "[s]exually tinged comments may be motivated by other reasons, such as personal animus, jealousy, or the desire to intimidate or bully." *Id.* at *30. Nonetheless, the Court correctly observed that "[m]otives like personal animus or bullying do not satisfy the because-of-sex requirement, even if the comments are profane, vulgar *or* have sexual overtones." *Id.* (citations omitted). The same holds true in the instant case where there may be various other motives that could be ascribed to Trent's conduct and comments but where there is *no* proof that any such conduct or comments were because of Mr. Funk's sex. In *Alamo Heights* and in this case, the absence of proof on the "because of sex" element dooms the same-sex harassment claims.

Concluding that there was no evidence that could support a reasonable jury finding that Montirrubio's conduct was motivated by sexual desire, *id.* at *35, the Court, following the directive of *Oncale*, proceeded to determine whether Montirrubio's conduct could be attributable to Clark's sex either through evidence of general hostility to women or direct comparative evidence of discrimination. Like Mr. Funk, Clark did not present any evidence that her alleged harasser had a general hostility toward other co-workers of the same sex. *Id.* at *36. The record instead reflected, as it does here, "inappropriate conduct toward both male and female co-workers, which does not raise an inference of discrimination based on sex." *Id.* at *38. Noting that the United States Supreme Court "was abundantly clear that gender motivation is not

WOODS ROGERS PLC
ATTORNEYS AT LAW

established 'merely because the words used have sexual content or connotations,' the Court concluded that Clark "experienced misery at work that no employee should endure," but that "it is not an actionable TCHRA violation." *Id.* at *41 - *42 (citing *Oncale*, 532 U.S. at 80).

b. *Lack v. Wal–Mart Stores, Inc.*

Similar to *Alamo Heights*, in *Lack*, the Fourth Circuit confronted the same issue of determining whether sex-based conduct constituted actionable same-sex harassment under the West Virginia Human Rights Act (WVHRA). While *Lack* involved a same-sex harassment claim brought under the WVHRA, the Fourth Circuit made clear that essentially the same analysis applies under the WVHRA as does under Title VII, and that *Oncale* provides guidance under both statutes. *Lack*, 240 F.3d at 257. The West Virginia Supreme Court's recognition of a same-sex harassment claim under the WVHRA was "[c]onsistent with principles articulated [in *Oncale*] by the Supreme Court of the United States in the context of sexual harassment suits brught under Title VII, the West Virginia Act's federal analogue." *Id.* Further, the West Virginia Supreme Court's recognition of such a claim was decided "[d]rawing extensively on the parallel Title VII ruling of the Supreme Court in *Oncale*." *Id.* at 260 (citations omitted).

In *Lack*, a male cashier claimed that his male supervisor sexually harassed him by, among other things, entering the cloakroom with the plaintiff and motioning as though he was going to unzip his pants, referenced the "bag between his legs," routinely made sexual comments such as having a "penis butter and jelly sandwich," and ending conversations by saying "spank me very much." *Id.* at 258. The plaintiff's manager went so far as to grab his crotch and say, in front of plaintiff's co-workers, "hey, Chris, here is your Christmas present." *Id.*

Citing *Oncale*, the Fourth Circuit noted the "formidable obstacle" the plaintiff faced in establishing the "because of sex" element in his same-sex harassment claim, noting that "whatever evidentiary route the plaintiff chooses to follow, *he or she must prove that the conduct*

WOODS ROGERS PLC
ATTORNEYS AT LAW

*at issue was not merely tinged with offensive sexual connotations, but constituted 'discrimination . . . because of sex.*" *Id.* at 260 (emphasis added). To succeed, the Fourth Circuit correctly observed that "a male plaintiff must establish that the harasser . . . treated him differently or with greater hostility, because he is a man." *Id.* at 261.

In ruling against the Plaintiff, the Fourth Circuit examined each of the possible evidentiary routes established in *Oncale* and determined that none had been satisfied. There appeared to be no evidence that the manager was homosexual and the Court noted that plaintiff could not simply rely "on the sex-specific nature" of the manager's comments "without producing plausible evidence that such comments were animated by [the manager's] hostility [to the plaintiff] as a man." *Id.* at 261. Further, the record showed that the manager generally treated men and women with the same boorish behavior, which undermined plaintiff's same-sex claim "to a substantial extent." *Id.* at 262. Finding that the plaintiff failed to provide any evidence that the challenged conduct was "because of sex," despite its vulgar and sexual nature, the Fourth Circuit reversed the jury's verdict in favor of the plaintiff and directed that judgment be entered for the defendant. *Id.* at 262.

c. *English v. Pohanka of Chantilly, Inc.*

The *English* case out of the Eastern District of Virginia is similarly instructive and strikingly similar. There, a male employee, English, of defendant car dealership claimed that a male co-worker, Dutchburn, sexually harassed him in violation of Title VII. *English*, 190 F. Supp. 2d at 836 – 39. Dutchburn was well known for lewd behavior among his co-workers, who were mostly male, and who mostly shrugged him off. *Id.* at 836 – 37. Dutchburn would say things to English such as wanting "to plant his salami between [English's] cheeks," asking English about his home life and sexual relations with his wife, telling English that "they needed to bond" and shortly thereafter pressing "his genitals against English's shoulders" while English

WOODS ROGERS PLC
ATTORNEYS AT LAW

was seated. *Id.* at 837. English testified that he asked Dutchburn to stop but the conduct persisted. *Id.* English also stated that Dutchburn would make comments to him like "I love you," and ask English "if he'd like to put his meatballs on [English's desk]." *Id.* at 838. Later, when English looked unhappy, Dutchburn asked "didn't your wife give you any, I don't think so, [sic] Maybe I should call her." *Id.* Dutchburn also asked if they could go for a walk to "smoke the peace pipes," at which point he looked down to his lap and said, "you know the bones." *Id.*

English stated he complained to his supervisor on multiple occasions, who allegedly told him "you're just going to have to tell [Dutchman] to back off, big guy." *Id.* In addition to allegedly reporting the above-instances, English also reported that Dutchburn constantly smacked his buttocks, rubbed his finger across English's back and touched English's shoulders. *Id.* His supervisor stated that he did not take any action against Dutchburn because "he did not consider English's comments to be complaints about sexual harassment." *Id.* Much like Mr. Funk in the present case, English claimed that Dutchburn's behavior caused English to experience anxiety attacks, and English was admitted to the hospital for treatment on one occasion. *Id.* at 839. English eventually resigned from his position and subsequently filed a hostile work environment and constructive discharge claim. *Id.*

In granting Defendant's Motion for Summary Judgment, Judge Lee observed that "a review of Dutchburn's unwelcome touching along with Dutchburn's comments fail to raise an inference that Dutchburn's overall behavior amounted to sexual propositioning . . . the evidence of Dutchburn's comments and his physical touching of English amount to teasing and horseplay, rather than harassment because of sexual attraction." *Id.* at 845. The Court further noted that English failed to provide any credible evidence that Dutchburn was homosexual. *Id.* 846. Following *Oncale*, the Court also reviewed the evidence for sexual animus toward men in the

WOODS ROGERS PLC
ATTORNEYS AT LAW

workplace, both generally and through direct comparative evidence, and found none. *Id.* at 847 – 48.

Ultimately, while the Court noted that Dutchburn was a "boor" and that it did not condone his behavior, *id.* at 845, 848, it "refuse[d] to descend down a slippery slope that would lower Title VII's bar to reach the juvenile behavior of a co-worker who simply cannot behave like a grown man." *Id.* at 848. That danger is even more present in the case at bar, where Mr. Funk actively participated in the boorish behavior until he decided he didn't like it anymore. Indeed, when Mr. Funk actually reported Mr. Trent's behavior pursuant to the terms of the harassment policy (after he was done complaining about the air conditioning and operating issues), his complaint even then was not that he was being sexually harassed, it was that Mr. Trent "***played too much, sexually.***" (Funk tr. 293–94). Where Plaintiff himself characterizes the behavior at issue as sexual horseplay, the direct and persuasive authority is clear that his claims are simply not actionable.

Consistent with the Supreme Court's direction in *Oncale*, the courts in *Alamo Heights*, *Lack*, *English*, and others have rejected same-sex harassment claims in circumstances with facts far worse than those herein. Like the courts did in those cases, and consistent with the Supreme Court's direction in *Oncale*, it is requested that this Court reject Mr. Funk's same-sex harassment claims herein because he has not offered proof that the conduct about which he complains was "because of [his] sex." Even where Plaintiff, in his Complaint and elsewhere, alleges that Mr. Trent made statements that on their face are sexually suggestive, *Alamo Heights*, *Lack*, and *English* direct that the *context* of the statement controls the analysis of the *content*. Mr. Funk's allegations that Mr. Trent would, for example, tease Mr. Funk about going to the bathroom with him, or ask Mr. Funk if he wanted to make love to a man, or say to Mr. Funk "get you some"

Woods Rogers PLC
Attorneys at Law

while allegedly unzipping his pants (but not exposing himself), are no different than (and in fact, much more benign than) the alleged harassers' actions in each of the above decisions.  In this case, a proper analysis of the context of the alleged incidents and statements show that while at times the content may have been sexual, there is not a scintilla of evidence that what Mr. Funk alleges to have occurred happened "because of [Mr. Funk's] sex."

    B.  **Funk's active and repeated participation in the alleged harassment shows it <u>was not unwelcome</u>**

As emphasized in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986), "[t]he correct inquiry is whether respondent by [] conduct indicated that the alleged sexual advances were unwelcome."  Mr. Funk, by his own admission *and* according to Ms. Lewis, Mr. Trent, Mr. Brummett, Mr. Hamlett, Mr. Phillips and others, participated in and initiated much of the sexual banter that took place in the K-Building.  As discussed above, *Plaintiff* called Mr. Trent "bitch," "queer," "faggot," and "gay," and "twisted his tit," *Plaintiff* repeatedly banged on the bathroom walls when others were using the restroom, *Plaintiff* talked about how he would "train" the young women he found attractive in the newspaper, *Plaintiff* talked about his sexual encounters in graphic detail, and *Plaintiff* constantly called Terry Trent "Sherry," against Mr. Trent's repeated express requests for Plaintiff to stop.  (*See* Sections II.4, II.5, II.6, *supra*).

The allegations of Mr. Trent's conduct, the Supreme Court instructs, must be analyzed in "the context in which the alleged incidents occurred. " *Meritor Sav. Bank, FSB*, 477 U.S. at 69. He and Mr. Funk engaged in a back-and forth banter that at times was sexual in nature, but not unwelcome.  Mr. Funk had myriad reporting options available to him that he could have invoked to get assistance from Human Resources, Ethics and Compliance, upper management, the legal department and others, and he failed to take advantage of them.  Instead, he gave as much as he got, and by all accounts but his own, had no problem with the exchanges.  Perry Funk is a man

WOODS ROGERS PLC
ATTORNEYS AT LAW

who turns purple with anger if someone *moves his gloves*. Yet, it was not until May 18, 2015 – years after he had moved to the K-Building – that he offhandedly complained about "sex stuff" as the third item on his list of grievances, behind his issues with *the air conditioning* and procedural matters. By his own admission, the conduct was not unwelcome to him until the day he reported it, and then it was dealt with: "***When I had enough of it, yes. It was dealt with.***" (Funk tr. 372) (emphasis added). This is consistent with his co-worker's (Mr. Brummett's) observation that "Everything was fine in the K-Building until it wasn't." (Brummet Decl. ¶ 8).

        C.   The only specific allegedly harassing conduct which Mr. Funk identifies was <u>not severe or pervasive</u>

While the conduct Mr. Trent allegedly engaged in may have been "inappropriate and immature, 'there is a line between what can justifiably be called sexual harassment and what is merely crude behavior.'" *Andrews v. Staples the Office Superstore, Inc.*, Civ. No. 7:11CV00037, 2013 U.S. Dist. LEXIS 92011, at *28 (W.D.Va. 2013) (citing *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008)). In defining this line, courts are instructed to look "at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at *29 (citing *Singleton v. Dep't of Corr. Educ.*, 115 F.App'x 119, 122 (4th Cir. 2004)). Plaintiff "'must clear a high bar in order to satisfy the severe or pervasive test'" to support her claims of a sexually hostile work environment. *Xerxes Corp.*, 639 F.3d at 676 *citing EEOC v. Central Wholesalers*, 573 F.3d 167, 176 (4th Cir. 2009). "Thus, [the Fourth Circuit] ha[s] held that "***conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment and that allegations [un]substantiated by accounts of specific dates, times or circumstances, are too general to suffice.***" *Id.* at 676 (internal quotations, brackets, and citations omitted) (emphasis added).

WOODS ROGERS PLC
ATTORNEYS AT LAW

In his deposition, Mr. Funk was pressed to provide specific examples of when Mr. Trent allegedly harassed him beyond his general allegations. Plaintiff responded with specific allegations that: (1) when Plaintiff said he was going to the bathroom, Mr. Trent would ask Plaintiff if he wanted Mr. Trent to go with him (and Plaintiff admitted that he was calling Mr. Trent "queer,", "Sherry," and "bitch" around this time as well) (Funk tr. 197–98), but Plaintiff testified that he did not consider this to be sex harassment and he did not report it (Funk tr. 200–01); (2) Mr. Trent would "rotate his hips" in what Mr. Funk interpreted as a sexual motion, but again Mr. Funk never reported this behavior (Funk tr. 203–05) and Mr. Trent did the same thing to Ms. Lewis (Funk tr. 206–07); (3) Mr. Trent said he wanted to have sex with Plaintiff's wife and Mr. Brummett's wife (Funk tr. 212), but Mr. Brummett did not take him seriously (Funk tr. 211, Brummett tr. 15–16) and Plaintiff himself joked about pimping out his first wife for $1,000,000 (Funk tr. 177); (3) years later, in 2015, Mr. Funk claimed that Mr. Trent would unzip his pants and say "get you some" to Mr. Funk (although he admitted Mr. Trent never exposed himself) (Funk tr. 221) and Mr. Funk testified that this was the first incident he reported to Mr. Kesler (Funk tr. 217); (4) Mr. Trent pulled *up* Mr. Funk's underwear when Mr. Funk was bent over (Funk tr. 226), which Mr. Trent testified was because half of Plaintiff's butt was exposed (Trent tr. 132), and Mr. Funk did not report this incident to anyone in management (Funk tr. 227); and (5) Mr. Trent teased Mr. Funk about Mr. Trent having a sexual relationship with Mr. Funk's mother-in-law in early May, 2015 (Funk tr. 232), which Plaintiff did not report (Funk tr. 231).

Those five incidents are the only ones that Mr. Funk specifically described as harassment against Mr. Trent in his deposition. (*see* Funk tr. 234 ("Q: So have we covered everything that

WOODS ROGERS PLC
ATTORNEYS AT LAW

he ever did to you that you considered to be sexual harassment? ... A: Yes, sir")).[9]  Items (3) and

(5) above, by their very nature, do not even arguably pertain to *same sex* harassment.  In fact,

they confirm that Mr. Trent's teasing and horseplay directed toward Mr. Funk was *not* because

of Mr. Funk's sex.  In two of the instances, Mr. Funk testified that he did *not* consider them to be

harassment at the time, in four of the instances Mr. Funk did not make any report to any member

of management, including Mr. Kesler, and throughout this period, *even Mr. Funk* admits to

actively participating in the sexual talk.

      Plaintiff also testified that Mr. Trent would refer to his penis as "big red," (Funk tr. 253)

but this comment was not directed at Mr. Funk and was said in the presence of Mr. Brummett

and Ms. Lewis, neither of whom took it as anything more than a joke.  (Brummett tr. 19, 21;

Lewis tr. 53–54).  As Ms. Lewis explained, "[w]e all joked and talked . . . and when we was

joking and talking, weren't nobody mad."  (Lewis tr. 54).

      Although Mr. Trent's alleged behavior was crude, these alleged incidents are not

sufficient to create a workplace that is "permeated with discriminatory intimidation, ridicule and

insult."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).  Rather,

these isolated actions are, at worst, indicative of the "crude behavior," "boorishness," and the

"occasional off-color joke or comment" that the Fourth Circuit has held to be insufficient

evidence of a cognizable claim of hostile work environment under Title VII.  *Ziskie*, 547 F.3d at

228; *see also Clark County School District v. Breeden*, 532 U.S. 268, 271 (2001) ("simple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment'").  Indeed, "[t]hese

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[9] In his Complaint and discovery responses, Mr. Funk has identified other instances that he either chose to exclude from his sworn deposition testimony or that were not significant enough for him to recall when specifically asked to list Mr. Trent's alleged offenses.  Among other things, Mr. Funk has claimed that Mr. Trent twisted Mr. Funk's nipple, but Mr. Funk admitted that he did the exact same thing to Mr. Trent.  In Mr. Funk's words, "I know I twisted his tit but I don't remember calling him a bitch."  (Funk tr. 305).

incidents, even if accepted as evidence of an unpleasant working environment, do not permeate [the workplace] "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Carroll v. Salon Del Sol, Inc*., 2016 U.S. Dist. LEXIS 179776, at *11 (W.D.Va. 2016) (internal citations and quotations omitted). This is particularly the case given that Mr. Funk was engaging in much of the same kinds of behavior with Mr. Trent during the time he now claims Mr. Trent was harassing him and where there is *no* evidence that any of this occurred "because of [Mr. Funk's] sex."

Moreover, Mr. Funk must show the workplace was both "subjectively and objectively hostile." *Young v. HP Enterprise Services, LLC*, 2011 WL 3901881, at *4 (E.D. Va. 2011), aff'd, 471 Fed. Appx. 133 (4th Cir. 2012). Mr. Funk must demonstrate that not only did he perceive the environment to be abusive and hostile, but that a "reasonable person would perceive the environment to be abusive and hostile" as well. *Xerxes Corp.*, 639 F.3d at 676. The objective prong of the test is "designed to disfavor claims based on an individual plaintiff's hyper-sensitivity." *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 327–28 (4th Cir. 2010); *see also Webb v. Baxter Healthcare Corp.*, 57 F.3d 1067 (Table), 1995 WL 352485 at * 4 (4th Cir. 1995) ("a thin skin cannot create a case, but a thick skin may defeat one"). "Proving conduct rises to the level of objectively severe and pervasive is a tall order." *Currie v. Arthur*, 2012 U.S. Dist. LEXIS 68000, at *20–21 (E.D.Va. May 15, 2012). As discussed above, the eye witnesses to Mr. Trent's and Plaintiff's behavior as well as Plaintiff's own doctor are uniform in describing it as "joking," "guys being stupid" or some related variant. (*See* Section II.5, *supra*). Again, the fact Mr. Funk was engaging in similar behavior as those about whom he complains

Woods Rogers PLC
ATTORNEYS AT LAW

demonstrates that he fails to meet both the subjective and objective standard for establishing a same sex harassment claim.

D.  Mr. Funk has failed to establish imputable liability to BWXT or BWXT-NOG

"[W]here an employer's response to reported harassment is handled in accordance with the company's established policy and includes conducting an investigation and taking action to address the findings in a prompt manner, such conduct is reasonably calculated to end the harassment, and, therefore, reasonable as a matter of law," even if the harassment later reoccurs, which it did not herein. *Lorenz v. Federal Express Corp.*, Civil Action No. 7:10-cv-00487, 2012 U.S. Dist. LEXIS 116464, at \*26 (W.D. Va. 2012); *see also Spicer v. Commonwealth of Va., Dep't of Corrections*, 66 F.3d 705, 711 (4th Cir. 1995) (en banc) ("When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well."). Where, as here, co-worker harassment is alleged, "employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop [the harassment]." *Lorenz*, 2012 U.S. Dist. LEXIS 116464 at \*26; *Caldwell v. Johnson*, 289 Fed. Appx. 579, 586–87 (4th Cir. 2008).

Mr. Trent is plainly not a supervisor, even by Plaintiff's own admission (Funk tr. 163–64). In *Marmon v. R. A. Lilly & Sons, Inc.*, 2015 U.S. Dist. LEXIS 89736, at \*17–21 (W.D.Va. July 10, 2015), this Court cited *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2448 (2013) for the proposition that "'[t]he ability to direct another employee's tasks is simply not sufficient' to create a supervisory relationship." The Court went on to hold that even where the plaintiff had submitted a declaration stating that the owner's son had significant influence over firing decisions it was not sufficient to establish the son as a supervisor. The Court explained, "vague, self-serving statements cannot create a genuine issue of material fact with respect to whether

Woods Rogers PLC
ATTORNEYS AT LAW

[owner's son] had the ability to take a tangible employment action…" *See also Webb v. Kroger Ltd. P'ship I*, 2017 U.S. Dist. LEXIS 20365, at *17 (W.D.Va. Feb. 14, 2017) citing *Howard v. Winter*, 446 F.3d 559, 566 (4th Cir. 2006) ("The fact that [Almond] was her superior in rank, however, [is] not enough to show that he [is] her supervisor for purposes of Title VII.").

So, the negligence standard applies. Where an employee has been harassed by a coworker, liability may be imputed to the employer in negligence under the fourth element *only* "if it knew or should have known about the harassment and failed to take effective action to stop it." *Xerxes Corp.*, 639 F.3d 658, 668–69 (quoting *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc)). "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (internal quotation marks omitted); *see also Mikels v. City of Durham*, 183 F.3d 323, 329 (4th Cir. 1999) ("[O]ur precedents ha[ve] long defined the basis for imposing liability under element (4) as being that after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer had taken 'no prompt and adequate remedial action to correct it.'") (alteration omitted) (quoting *Spicer v. Commonwealth of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc)).

As a preliminary matter, because none of the behavior about which Mr. Funk complained was harassment "because of [Mr. Funk's] sex," it simply does not matter if he reported it to a supervisor and it was not acted upon. (*see* Section IV.2 *supra*). There can be no Title VII violation for failing to act on a report of conduct which is not itself a Title VII violation. *Id.*

Regardless, the evidence is undisputed that Mr. Funk *never* followed the correct reporting procedures under the harassment policy (*see* Section II.3, *supra*). Indeed, for his later allegations against Mr. Hamlett and Mr. Phillips, he never reported them at all. Mr. Funk's alleged

WOODS ROGERS PLC
ATTORNEYS AT LAW

complaints to Mr. Kesler[10] – who occupied the lowest level supervisory position in the Company – are not sufficient to put Defendants on notice. The multitude of harassment reporting options in the harassment and other policies are specifically identified for a reason: they will provide Defendants with notice. Once Mr. Funk's offhand harassment complaint was made to one of the many correct recipients of complaints under the harassment policy, the issue was investigated and resolved to Plaintiff's satisfaction. (*see* Section II.4, *supra*).

Mr. Funk's failure to avail himself of Defendants' myriad reporting options under the harassment policy is fatal to his claim. As the Fifth Circuit Court of Appeals has held, even where an employee reports harassing conduct to a supervisor, if the employer's harassment policy includes further reporting options and the employee fails to take advantage of them, then the claim should be dismissed. *See Hockman v. Westward Communications, LLC*, 407 F.3d 317, 330 (5th Cir. 2004) ("We therefore affirm summary judgment for Westward on Hockman's sexual harassment claim; Hockman cannot prove that Westward failed to take prompt remedial action where she unreasonably failed to take advantage of the corrective opportunities provided by Westward."). Here, Mr. Funk's supervisor was not even a listed reporting option in the harassment policy. Where he failed to make a single report beyond Mr. Kesler until Mr. Kesler took Plaintiff's complaints to a higher level – at which point they were addressed to Plaintiff's satisfaction – Plaintiff cannot maintain a Title VII harassment claim.

### E. Defendants' Preventative and Corrective Measures and Mr. Funk's Failure to Take Advantage of His Complaint Options Preclude His Claims

"The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination[,]" so long as the policy is effective and administered in good

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[10] Mr. Kesler, like Mr. Funk, was an employee of BWXT-NOG. (Ex. AA at 562). Thus, in any event, a complaint to Mr. Kesler could *not* have put BWXT on notice of any alleged harassment.

faith. *Xerxes Corp.*, 639 F.3d at 669. As discussed above and as evidenced on their face, Defendants' anti-harassment and other policies "provide[d] reasonable procedures for victims to register complaints." *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc); *Howard v. Winter*, 446 F.3d 559, 568 (4th Cir. 2006). These policies were provided to employees directly, available through the intranet, posted around the workplace and available through requests to supervisors and Human Resources. (*See, e.g.*, Ferguson Decl. ¶ 4). Defendants conducted training on these policies, with supervisors, including Mr. Kesler, receiving training just prior to Plaintiff's May 18, 2015 complaint. (30(b)(6) tr. 12-13). All non-supervisory employees received training shortly after Mr. Funk's May 18, 2015 complaint, and although he claims the training was somehow retaliatory, the training schedule had been established prior to plaintiff's complaint and the ensuing investigation. (Keller tr. 35).

"When the defendant has adopted an anti-harassment policy, its distribution "provides 'compelling proof' that the [employer] exercised reasonable care in preventing and correcting harassment." *Marmon*, 2015 U.S. Dist. LEXIS 89736, at *18–19 (W.D. Va. July 10, 2015) (citing *Hoyle v. Feightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011); *Barrett v. Applied Radiant Energy,* 240 F.3d 262, 266 (4th Cir. 2001)). In such cases, the plaintiff "must show by a preponderance of the evidence that the policy was either adopted or administered in bad faith or that it was otherwise defective or dysfunctional." *Id.*

Mr. Funk had a duty to "avail himself of the employer's preventive or remedial apparatus." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 638 (7th Cir. 2009). Title VII "borrows from tort law the avoidable consequences doctrine under which victims have a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute." *Penn. State Police v. Suders*, 542 U.S. 129, 146 (2004)

WOODS ROGERS PLC
ATTORNEYS AT LAW

(citations and quotation marks omitted). "*If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care.*" *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (emphasis added). A plaintiff's failure to utilize an available complaint procedure relieves an employer of responsibility for failure to respond to and correct a hostile work environment. *McKinney v. G4S Gov't Sols., Inc.*, 179 F. Supp. 3d 609, 627 (W.D. Va. 2016); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 270 (4th Cir. 2001); *Barrett*, 240 F.3d at 267. Funk testified that as soon as a proper report under the harassment policy received his complaint, the issues were investigated and resolved. (*See* Section II.4, *supra*). He also admitted that he simply failed to report four of the five specific instances of harassment he described in his deposition. (*See* Section IV.2.C, *supra*).

"[A]n employer cannot be expected to correct harassment unless the employee makes a *concerted effort* to inform the employer that a problem exists" under its procedures. *Howard*, 446 F.3d at 567 (emphasis added). Thus, "employee[s] claiming harassment by a coworker bear[ ] significant responsibility in notifying the employer." *Id.* at 570; *see Barrett*, 240 F.3d at 268 (noting that "[l]ittle can be done to correct [harassing] behavior unless the victim first blows the whistle on it"); *see also Xerxes Corp.*, 639 F.3d at 674 (same). *See also Flint v. Action Personnel, Inc.*, 2015 U.S. Dist. LEXIS 18800, at *9 (W.D. Va. Feb. 13, 2015) (holding employer not negligent as a matter of law where employee was familiar with, but failed to take advantage of, harassment policy and reporting mechanism).

   3.   Plaintiff's Admissions Preclude His Retaliation Claims, Which Fail as a Matter of Law

   To state a claim for retaliation, "a plaintiff must allege: (1) engagement in protected activity, (2) 'materially adverse action . . . which . . . might well have dissuaded a reasonable worker from making or supporting a charge of discrimination,' and (3) causality." *Hinton v. Va.*

WOODS ROGERS PLC
ATTORNEYS AT LAW

*Union Univ.*, 185 F. Supp. 3d 807, 831 (E.D. Va. 2016) citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); *Mascone v. Am. Physical Soc'y*, 404 F. App'x 762, 765 (4th Cir. 2010). "An action is not materially adverse if it amounts to 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Supinger v. Virginia*, 167 F.Supp. 3d 795, 809–10 (W.D.Va. 2016) (citing *White*, 548 U.S. at 68).

As discussed above, Plaintiff's threadbare retaliation claims – that his car was booted, that anonymous employees called him names, that he was sent home early once, that he and all other employees underwent sex harassment training and that he underwent a routine security clearance – came apart in his deposition where it was established he did not suffer any materially adverse employment action and where he admitted that each of the actions he claims are retaliation were entirely consistent with Company policy. (*See* Section II.6, *supra*). Again, his car was booted because he was illegally parked and the boot was removed once he parked legally; he was sent home early after going to the clinic for health issues; he admitted that the harassment training (and his referral to EAP) were positive experiences for him; he never provided either defendant with any specifics necessary to investigate and correct his allegations that anonymous employees were calling him names and saying he got Mr. Trent, Mr. Kessler and Ms. Lewis fired; and, his security clearance review was in no way related to his complaints against Mr. Trent. *Id.* Mr. Funk's remaining allegations of retaliation—that co-workers (again, anonymous) gave him a hard time about having to attend a harassment training class, that a security guard asked him if he was going to stab a co-worker in the back, or that Mr. Lemon directed Mr. Funk not to converse with a customer during a facility tour—are not even remotely adverse, much less materially adverse. And, Mr. Lemon testified that *all* employees in the K-Building are directed to answer customer questions with short, yes or no answers during

WOODS ROGERS PLC
ATTORNEYS AT LAW

customer tours. (Lemon tr. 64–65). Contrary to any notion he was retaliated against after he complained about the air conditioning, procedural issues and Mr. Trent's behavior, Mr. Funk has received a promotion and an increase in pay. (Funk tr. 147–49).

Courts have consistently held that even where an employee's co-workers ostracize or show antipathy for a co-worker, such actions do not constitute the "material adverse action" required to show actionable harassment. *See White* 548 U.S. at 68. ("[C]ourts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable.") (citations and quotations omitted); *Bald Head Island Mgmt.*, 259 F.3d at 271–72 (incivility of coworkers failed to show a material adverse action to support a retaliation claim). None of Plaintiff's alleged instances of retaliation show the type of "material adverse action" necessary to support an actionable claim for retaliation. *Caldwell v. Johnson*, 289 Fed. at 588 ("a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination").

Courts have also routinely granted summary judgment for retaliation claims where, as here, the employer has shown that they worked diligently to accommodate an employee's needs with regards to benefits following protected conduct. *See Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010) (Summary judgment on retaliation claim affirmed where employer gave employee additional requested time off, provided alternative work schedule, provided HR and FMLA support, as such "accommodations show an intent to maintain an employment relationship with [plaintiff], not force her to quit."). While Plaintiff alleges that he was retaliated against when he was referred to the EAP, he made clear in his deposition that he liked the EAP: "I was happy. I was doing good with the EAP. I was happy." (Funk tr. 271). Here, Mr. Funk

WOODS ROGERS PLC
ATTORNEYS AT LAW

simply did not suffer any adverse employment action but rather was promoted and had his pay increased.

Courts in this Circuit have held that promotions and pay raises such as were afforded Mr. Funk negate an inference of retaliation against an employee who engaged in protected conduct. *See EEOC v. TJX Cos*., No. 7:07-CV-66-F, 2009 U.S. Dist. LEXIS 4547, at *21–22 (E.D. N.C. Jan. 22, 2009). Again, the only employment actions taken with respect to Mr. Funk have been a promotion and an increase in pay. (Funk tr. 147–49).

4.   Plaintiff Has No Cognizable Claim for Damages

Mr. Funk suffered no adverse employment action as a result of any of the allegations in his Complaint and his job position and rate of pay have only increased during the relevant time frame. (Funk tr. 147–49). While Mr. Funk claims that he occasionally clocked out to avoid Mr. Trent or the one issue with Mr. Hamlett, those occasions are rare and Mr. Funk also admitted that he would take the time to engage in his favorite activity, hunting. (Funk tr. 382–83, 415). So, Plaintiff's out-of-pocket loss is simply *de minimis* if he suffered any loss at all. Any *de minimis* loss he claims to have suffered is more than offset by his promotion and pay increase.

The main aspect of Plaintiff's damages claim is his allegation of suffering emotional distress. Mr. Funk testified that the alleged distress manifested itself in two ways: (1) high blood pressure and anxiety issues; and (2) erectile dysfunction issues. (Funk tr. 383–84). Those medical conditions, however, long pre-dated any of Plaintiff's allegations in this case. As Plaintiff's medical records demonstrate, he was being treated for both conditions in 2012, well before he alleged the harassment in this case began in 2014, and he did not describe any harassment issues to his doctor until June, 2015, after he belatedly reported the air conditioning,

WOODS ROGERS PLC
ATTORNEYS AT LAW

operations issues, and what he now claims were harassment issues.[11]  (Ex. CC at 815–16, 837). Although Mr. Funk at first denied that his conditions predated the alleged harassment, when confronted with his medical records he was forced to admit that his hypertension and anxiety and his erectile dysfunction had manifested themselves well *before* he claims he suffered any harassment at the hands of Mr. Trent.  (Funk tr. 393–94).

## V.  <u>Conclusion</u>

Perry Funk and some of his co-workers engaged in boorish behavior that was not appropriate for the workplace, but none of which was sexual harassment under the law and none of which was "because of [his] sex."  Mr. Funk was an active, voluntary participant in the behavior.  Nonetheless, in May, 2015, Mr. Funk "had enough" and reported it to management, albeit in an offhand way.  Still, it was immediately investigated and every employee with whom Mr. Funk had expressed issues was terminated, whereas Mr. Funk was promoted and received a pay increase.  His subsequent allegations of harassment and retaliation were revealed to be baseless in his deposition, and he admitted that he never reported them to either Defendant anyway.  Mr. Funk has no proof that any conduct or comments directed toward him was "because of [his] sex."  To cap off the inability of Plaintiff to establish any of his claims in this suit, his damages are practically, if not entirely, nonexistent.  Thus, it is requested that summary judgment be entered in favor of defendants on all claims herein.

Woods Rogers PLC
ATTORNEYS AT LAW

---

[11] Relevant copies of Plaintiff's medical records are attached as **Exhibit  CC**.

Respectfully submitted,

**BWX TECHNOLOGIES, INC., ET AL.**

By: ___s/ Michael P. Gardner_____

Thomas R. Bagby, Esquire (VSB #14853)
**bagby@woodsrogers.com**
Michael P. Gardner. Esquire (VSB #80380)
**mgardner@woodsrogers.com**
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24011
Telephone:  (540) 983-7600/Facsimile: (540) 983-7711
 *Counsel for Defendants BWX Technologies, Inc., and BWXT-Nuclear Operations Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this <u>8th</u> day of June, 2018, the foregoing was filed with the Court's CM/ECF system, providing notice and a copy of the foregoing to all counsel of record.

_____ s/ Michael P. Gardner _____

W<small>OODS</small> R<small>OGERS</small> PLC
ATTORNEYS AT LAW