CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
08/22/2018
JULIA C. DUDLEY, CLERK
BY: s/ F. COLEMAN
 DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| PERRY FUNK,<br>    *Plaintiff,*<br>v.<br>BWX TECHNOLOGIES, INC. AND BWXT-NUCLEAR OPERATIONS GROUP, INC.,<br>    *Defendants.* | CASE NO. 6:16-cv-53<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

    Terry Trent and Perry Funk were coworkers. Both are male. The evidence construed in Funk's favor shows the following. Trent opened his fly and thrust his crotch toward Funk's face while Funk drank from the water fountain. Trent grabbed and jerked Funk's underwear. Trent mimicked "humping" Funk. Trent (falsely but repeatedly) asserted to coworkers that he and Funk had sex. Trent announced (again, falsely) that Funk "sucked his dick." Trent asked Funk if he wanted "to get some" and frequently propositioned Funk. Trent stated he wished the two men were in jail so Funk could be his "bitch" and "make love to" him. Trent referred to his penis as "Big Red" around Funk. Trent proclaimed himself "queer" because he let other men "suck my dick." And Trent's actions led Funk to fear Trent desired him sexually and to wonder to his supervisor if Trent was "queer."

    The defendants say there is no evidence from which a reasonable jury could infer Trent's harassment was "because of sex." But reread the last paragraph. Trent's own words and deeds permit a jury to reasonably conclude otherwise. The defendants' arguments to the contrary overstate precedent on same-sex sexual harassment, erecting evidentiary barriers the law does not support. Or they shade the facts against, rather than for, Funk. So Funk's hostile work environment claim will survive. His retaliation claim, though, will not.

1

## I. Procedural Posture

This is a Title VII discrimination case. Perry Funk (Plaintiff) asserts two claims. The primary claim is for a hostile work environment created by Trent and two other coworkers. Secondarily, Funk claims his employer retaliated against him in various ways after he reported Trent's harassment. The defendants are BWX Technologies, Inc. (BWXT) and BWXT-Nuclear Operations Group, Inc. (Nuclear Operations). Which of these entities is Plaintiff's employer is a muddled matter of dispute addressed later. Upon the close of discovery, BWXT and Nuclear Operations (Defendants) moved for summary judgment. At the summary judgment stage, the Court must take the facts and inferences in the light most favorable to Plaintiff, the non-moving party. *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 341 (4th Cir. 2017).

## II. The Basic Facts, in Plaintiff's Favor

Plaintiff has been employed by one of the Defendants since 1998. Starting in January 2011, he worked in the "K-Building" as a "wrought material coupon coordinator." (Funk Dep. at 128, 142). Terry Trent is the primary alleged harasser in this case. After an internal investigation into his actions, Trent was terminated in June 2015. Plaintiff assumed Trent's position as "senior material control inventory technician." (Funk Dep. at 144). Jerome Kesler was Plaintiff's manger prior to his work in the K-Building. He was a "front line" manager. (Ferguson Dep. at 41).

\*

The triggering event of this litigation occurred on May 18, 2015. Plaintiff and a coworker, Janice Lewis, had a disagreement about the air conditioning, and Plaintiff approached front line manager Kesler about the issue. (Funk Dep. at 258–59, 284). Plaintiff also made other complaints about Lewis' work performance. Kesler responded by suggesting the two men go to

human resources (HR). (Funk Dep. at 285–88). Eventually, the conversation was escalated to a "section manager" and an HR employee. (Ferguson Dep. at 41). After discussing the original issues, Plaintiff then brought up the alleged harasser in this case, Terry Trent, who he described as "playing around too much sexually." (Funk Dep. at 294).

Plaintiff mentioned that Trent opened his fly around Plaintiff and remarked "taste this" while Plaintiff was drinking water, and that Terry pulled Plaintiff's underwear. (*E.g.*, dkt. 39-1 at ECF 2, 12). Due to his elevated blood pressure and general distress from recounting the harassment, Plaintiff prematurely departed the meeting. The next day, however, he met with HR and a compliance officer to further discuss the harassment by Trent. (Funk Dep. at 300).

\*     \*

Whether and to whom Plaintiff lodged, prior to May 2015, complaints about Trent's behavior is a disputed issue discussed below. For present purposes however, there is evidence that Trent mercilessly harassed Plaintiff in numerous ways. Plaintiff admitted that the harassment began before 2014 ("probably midway 2011") but that "it got really bad" at that time. (Funk Dep. at 195, 200). The water fountain incident was a turning point. (Funk Dep. at 195–96, 229–30). Prior to that incident, Trent had propositioned Plaintiff "many times" to go to the bathroom with him. (Funk Dep. at 197).

In late 2014, Plaintiff was bending down in the warehouse and Trent "wrenched his hands down [Plaintiff's] pants and pulled [up his] underwear." (Funk Dep. at 225–26). Plaintiff told Trent "don't ever do that again." (Funk Dep. at 226). Trent remarked to Plaintiff during 2014 or 2015 "have you ever made love to a man?", "Do you want to get some?", and "I'm queer because I let [another man] suck my dick." (Dkt. 39-1 (BWXT Investigative Report Notes) at ECF 4, 13; Funk Dep. at 203, 216).

3

Trent told another employee that he had sex with Plaintiff and "sucked his dick." (Dkt. 39-1 at ECF 4). Trent also remarked to coworkers that he had sex with Plaintiff in front of manager Kesler while the three men were on lunch break, and Trent would commonly tell colleagues he had sex with Plaintiff at night. (Dkt. 39-1 at ECF 4; Funk Dep. at 236). Trent frequently referred to his penis as "Big Red" around coworkers. (Dkt. 39-1 at ECF 6, 7, 11). Trent told Plaintiff that he wanted Plaintiff "to be his bitch, go to jail with him, and spend all night in jail so he can make love to me." (Funk Dep. at 199, 306).

Lewis, the coworker who spawned the AC issue, stated that Trent did "things [of a] sexual nature at Funk but Funk never" reciprocated. (Dkt. 39-1 at ECF 7). Around April 2015, Plaintiff complained to Kesler that Trent "put his arm around him," and Trent was apparently informed that was "not acceptable as a manager." (Dkt. 39-1 at ECF 9). Plaintiff expressed concern to Kesler that Trent was "a queer" who "wants me." (Dkt. 39-1 at ECF 9). Trent also had a "bad habit of coming up to you and humping his hips at you," which Plaintiff asked him to stop doing. (Funk Dep. at 202).

Defendants instituted an investigation after Plaintiff complained of Trent's behavior to the managerial hierarchy in May 2015. The resulting report concluded that Trent "used foul language, made inappropriate sexual remarks, sexual gestures, [and] grievous sexual actions which created a hostile or intimidating environment . . . ." (Dkt. 39-1 at ECF 15). "These actions have been substantiated by several employees," and "many of [Trent's] remarks and actions have been witnessed by others, including Kesler"; Trent, when pressed, "eventually admitted to making sexually explicit remarks to Funk and also admitted to inappropriate actions toward Funk." (Dkt. 39-1 at ECF 15, 17). The report recommended that Terry be terminated, and he was.

4

Kesler admitted to witnessing the harassment and to being told of the harassment by Plaintiff. (Dkt. 39-1 at ECF 18). Kesler "was told repeatedly about the sexual harassing behavior [and] hostile work environment" but "did not investigate any of the allegations nor did he report it to his management." (Dkt. 39-1 at ECF 16; Funk Dep. at 217–18). For failing to report Plaintiff's allegations, Kesler was also terminated. (Dkt. 39-1 at ECF 18). The investigation also revealed that Plaintiff used "foul language" and had "strained work relationships, stress and anxiety," and thus he was referred for counseling. (Dkt. 39-1 at ECF 16–18).

Plaintiff also contends that, even after Trent was fired, he was subjected to retaliation and additional harassment. These facts are discussed below where relevant. Generally, Plaintiff complaints that he was retaliated against by (1) being referred to counseling, and (2) other coworkers, who called him names like "snitch" and resented him because they perceived his complaints as the impetus for sexual harassment training. He also contends that, after Kesler's termination, his new supervisor and another employee began harassing him.

### III. Administrative Exhaustion

Before reaching the merits, the Court must address Defendants' argument that Plaintiff did not properly exhaust his administrative remedies for the hostile work environment claim. Defendants' basic point is that Plaintiff has no claim against BWXT because it isn't his employer, and he has no claim against Nuclear Operations because it wasn't named in his EEOC charge.

Plaintiff listed BWXT as his employer in his EEOC charge but noted he was "not certain of the exact name of my employer" and requested as part of the investigation that the "EEOC determine the name of my employer and proceed against that entity." (Dkt. 30-27 at ECF 8).

5

The substance of the charge stated that BWXT was his employer but that it is part of Nuclear Operations.

BWXT wrote to the EEOC on March 28, 2016. It maintained that the "correct name of the entity employing Mr. Funk is" Nuclear Operations, which "is a subsidiary of [BWXT]." (Dkt. 30-27 at ECF 2). In other words, Defendants claimed that Plaintiff had it backwards: Nuclear Operations was the employer and part of BWXT, not the other way around.

Nonetheless, the response letter confronts Plaintiff's allegations head-on, addresses his employment at "BWXT," and ambiguously refers to his employment with "the Company." (*Id.*). And although Defendants assert in their opening brief that Plaintiff is employed by Nuclear Operations, citing to its interrogatory responses (dkt. 30 at 19), the Court has been unable to find those responses in the evidentiary attachments to their brief. (*See generally* dkts. 30-1 through 30-31). On the other hand, without expressly stating the point, Plaintiff's brief implies that Nuclear Operations was "Mr. Funk's correct employer" and the "correct BWXT entity on notice" of the charge. (Dkt. 39 at 26–27).

Defendants fault Plaintiff for never amending his charge "in response" to BWXT's letter *to the EEOC* asserting that Nuclear Operations was the correct defendant. (Dkt. 30 at 19). This contention is problematic because the letter was not sent to Plaintiff, and there is no evidence he received a copy of it while there was still time to amend his charge. (Dkt. 39 at 27 n.20).

Legally, though, the argument has some support. Title VII permits a lawsuit "against the respondent named in the charge." 42 U.S.C. § 2000e–5(f)(1). Under this "naming requirement," the Fourth Circuit has generally hued closely to strict compliance with that requirement. *See, e.g.*, *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013); *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005); *Evans v. Techs. Applications & Serv. Co.*, 80

6

F.3d 954, 962–63 (4th Cir. 1996).

On the other hand, the implementing regulations of Title VII make clear that a charge need only be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). That is especially critical here when the charge itself telegraphed to Defendants that Plaintiff was unclear which of them was the proper party, and the companies made what was effectively a joint (and full) response.

Moreover, "Title VII does not require procedural exactness from lay complainants: EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *Alvarado v. Bd. of Trustees of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988). Title VII's naming requirement is meant to "provide notice" and "permit the EEOC to attempt voluntary conciliation." *Id*. If those conditions are met, the Fourth Circuit does not require dismissal when the named and unnamed entities are functionally identical. *Id*. (permitting claims where charge named a university as defendant rather than its technical legal composition, the board of trustees); *see Equal Employment Opportunity Comm'n v. Am. Nat. Bank*, 652 F.2d 1176, 1186 n.5 (4th Cir. 1981) (observing that some courts have developed exceptions to strict adherence of naming requirement "where it is clear that the defendant through some relationship with the named respondent had notice of the charges and participated in the conciliation process").

Thus, district courts in the Fourth Circuit commonly let a case proceed where there is "substantial identity" between the party named in the EEOC charge and the present defendant. *E.g.*, *Ross v. Franklin Cty. Dep't of Soc. Servs.*, 186 F. Supp. 3d 526, 530–31 (W.D. Va. 2016) (Conrad, J.) (permitting claim where plaintiff noted uncertainty about proper party in her charge, there was no prejudice, and there was substantial identity between county social service entities);

7

*Keener v. Universal Companies, Inc.*, 128 F. Supp. 3d 902, 915 (M.D.N.C. 2015) (compiling cases on substantial identity exception); *see also Alvarado*, 848 F.2d at 461 (observing that "substantial identity" exception "has been explicitly adopted by at least two Circuits and has been applied by several district courts in this Circuit"). Here, the EEOC charge put both Defendants on notice of the substance of the allegations and explicitly flagged the identity issue. They responded jointly (but not to Plaintiff) and mounted a full-throated defense in their EEOC letter, which itself contained vagaries: It claimed that Nuclear Operations was the employer, but in the same breath referred to "BWXT," and compounded confusion by referring ambiguously to "the Company." The response thus reflects the fact that Defendants are substantially identical for purposes of this case. Finally, Defendants do not claim they suffered any prejudice, nor could they—they had notice of the claim before the EEOC and have litigated the case in this court. Thus, the Court finds that Plaintiff properly exhausted his administrative remedies.[1]

### IV. Hostile Work Environment

The elements of a hostile work environment claim are (1) unwelcome conduct, (2) because of sex, (3) that is severe or pervasive, (4) which is imputable to the employer. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015).

**A.     Harassment "Because Of" Sex**

Defendants' primary argument is that Trent's harassment was not "because of" Plaintiff's

---

[1] Defendants raise a second issue. Citing to Plaintiff's Charge and complaint, they point out that he contended that Trent's harassment began in the summer of 2014. Yet then Plaintiff testified that some harassment from Trent occurred as far back as 2011. Defendants say the original statements are "judicial admissions" that prohibit reliance on any pre-2014 acts by Trent. But this is a throwaway argument. Defendants cite only a generic Fourth Circuit case that is factually different—it found an explicit waiver in a reply brief to be a judicial admission, *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 263–64 (4th Cir. 2004)—and accompanied by no analysis. They do not even bother to identify which acts they claim would fall outside their asserted pre-2014 cutoff.

8

sex. A reasonable jury could disagree.

### 1. Trent's harassment

The parties agree that the Supreme Court's 1998 decision *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), as well as the Fourth Circuit decision in *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255 (4th Cir. 2001), provide the framework for analyzing "same sex" harassment.[2] *Oncale* held that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff" and the harasser are the same sex. 523 U.S. at 79. A plaintiff can meet the "because of sex" element through several "evidentiary route[s]": (1) if there is "credible evidence that the harasser was a homosexual," or (2) the harasser evinces "general hostility" to same-sexed coworkers, or (3) "direct comparative evidence" shows "how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id*. at 80–81. At the same time, as in any case, the use of words with sexual content or connotations is not "automatically discrimination." *Id*. at 80.

Defendants, in briefing and at oral argument, repeatedly contended there is *no* evidence that Trent was a homosexual.[3] Although several declarants agreed with that statement, Trent's own actions and deeds taken together in context would allow a reasonable juror to conclude otherwise. Most obviously, by his own proclamation, Trent was "queer." And most seriously, Trent touched or acted toward Plaintiff in an overtly sexual way. Trent commonly imitated humping Plaintiff. Trent touched and pulled Plaintiff's underwear while Plaintiff bent over. Trent unzipped his fly near Plaintiff, thrust his hips towards Plaintiff's face, and said "taste this."

---

[2]  Although *Lack* interpreted a state sexual harassment law, the state's highest court had adopted the *Oncale* framework.

[3]  For instance, Defendants rely on Plaintiff's statement that Trent "wasn't a queer." (Funk Dep. at 250). But Plaintiff also testified he "wasn't sure" if Trent loved him or was a heterosexual.

9

And Trent put his arm around Plaintiff in a way deemed inappropriate.

Trent repeatedly propositioned Plaintiff. He asked Plaintiff to join him in the bathroom. He expressed his desire to make love to Plaintiff in jail. He inquired whether Plaintiff had had sex with a man before. He asked Plaintiff if he wanted "to get some." He exclaimed himself a "queer." He bragged about other men performing fellatio on him. He announced to coworkers (by all accounts, falsely) that Plaintiff had performed fellatio on him and that the two men had sex on lunchbreak or after work. And Plaintiff took this seriously: He wondered to Kesler if Trent was "queer" and feared that Trent desired him sexually.

A juror might conclude that Trent simply hadn't matured since high school. Maybe he was antagonizing Plaintiff out of a perverse sense of amusement, or trying to bully him. Alternatively, the antics could have been a weird workplace bonding ritual, as the record contains evidence that Plaintiff himself used sexualized or crude language at times.

But no juror on this record would be *required* to reach those conclusions. And a reasonable juror would be justified to infer from it all that Trent harnessed some level of sexual desire for either men generally or Plaintiff in particular. *See Oncale*, 523 U.S. at 80 (explaining that inference of sex discrimination exists if there is "credible evidence that the harasser was homosexual"). At bottom, Defendants ask the Court to sit as a super-jury and blind itself to Trent's own repeated, unabashedly sexual dispositions and propositions, as well as his overtly sexual conduct. But Defendants' arguments are ones for the jury, not for summary judgment.

At oral argument, Defendants asserted that the evidence of what Trent said and did is not enough to satisfy *Oncale*. They contended that the evidence must be "coupled with something else." That requirement is nowhere in *Oncale*. Nothing in the law says that a harasser's deeds or actions can never by themselves satisfy the "because of sex" element. And nothing in *Oncale*

says the "credible evidence" standard of homosexual desire is an extreme evidentiary threshold as Defendants demand, like proof of prior homosexual acts.

Of course, one must—as in any hostile work environment case—take account of "a constellation of surrounding circumstances, expectations, and relationships" to "distinguish between simple teasing and roughhousing." *Oncale*, 523 U.S. at 82. Defendants no doubt have *arguments* touching on this point, but they are just that: Arguments about the factual nuances of the workplace that a jury must decide. At bottom, guided by *Oncale*'s lights of "common sense" and "appropriate sensitivity to social context," it is difficult to think of a more obvious and credible expression of sexual interest than Trent's repeated "explicit and implicit proposals of sexual activity" and his sexualized touching of Plaintiff. *Id*. at 80, 82.

Further, evidence supports one of *Oncale*'s alternative "evidentiary routes"—that Trent did not behavior similarly towards women. Specifically, Lewis, a female, indicated that Terry did not make sexual remarks to her because "she doesn't have the right parts for him." And Trent admitted he "does talk [about] things of a sexual nature with Funk but never in front of women." (Dkt. 39-16 at ECF 195). This evidence could support a jury finding either that Trent was a homosexual or that he acted differently towards women generally. The "because of sex" element thus survives summary judgment for an alternative reason.

### 2. Actions by subsequent employees

This is a natural point to discuss incidents unrelated to Trent. After Trent and Kesler were fired in June 2015, Plaintiff began working with other employees, namely Tommy Phillips and Greg Hamlett.

\*

While the new trio was eating in Plaintiff's office one day, Hamlett offered his corn dog

with mustard to Plaintiff, saying "here, take a bite." (Funk Dep. at 278). Plaintiff "normally" would not have done so—"I said, 'Well, I don't eat after anybody, but I'll take a bite.'"—and then did so "to fit in." (Funk Dep. at 278, 279). Hamlett complimented Plaintiff: "You're learning. You got to learn to relax. You got to calm down. You got to relax. You got to let things go, and things will be all right," which Plaintiff thought was "great advice." (Funk Dep. at 279).

Phillips, however, then "jumped up with his corn dog at his zipper and said 'Oh, bite mine. Bite mine.'" (Funk Dep. at 278). Plaintiff described Phillips' actions as "terrible" and acknowledged that it was well known in the office that he did not eat after others, even his wife. (Funk Dep. at 278–79). But Plaintiff did not complain about Phillips' conduct to any manager or supervisor. (Funk Dep. at 281, 282). He later told his wife that the men were "just trying to get me to loosen up." (Funk Dep. at 282). Both Phillips and Hamlett denied that the incident had a sexual component. (*See* Phillips Dep. at 34; Hamlett Dep. at 28)

\*    \*

Additionally, there was a "bathroom" incident in October 2015. The three men engaged in something of a game where they attempted to startle each other in the bathroom by hitting the door or wall. On one occasion Hamlett and Phillips startled Plaintiff, who urinated on himself. (Funk Dep. at 265). The men laughed and even viewed it as a joke, and Plaintiff did not have a problem with it because he vowed "to get [Hamlett] back." (Funk Dep. at 265, 266).

Later, Plaintiff followed Hamlett to the bathroom, reiterating to Phillips he was going to get Hamlett back. (Funk Dep. at 267). Plaintiff slapped the door. (Funk Dep. at 268). According to Plaintiff, Hamlett (who was standing to urinate) then opened the door with his penis exposed and exclaimed to Plaintiff "get you some, motherfucker." (Funk Dep. at 268, 270,

12

274).

Plaintiff admitted that he did not think Hamlett meant any harm by the episode and believed "he did it without thinking. He c[a]me back and apologized to me. And he said he was very sorry." (Funk Dep. at 275). Prior to that incident, Hamlett had never done anything to Plaintiff that Plaintiff thought was inappropriate. (Funk Dep. at 271). Plaintiff did not report the incident to a supervisor or manager. (Funk at 274).

\* \* \*

Both of these one-off incidents do not form the basis of a hostile work environment post-May 2015. Regarding the corn dog incident, all three men acknowledged that the event was not "because of" Plaintiff's sex, but instead was an ill-conceived attempt to get Plaintiff to "loosen up." Moreover, Plaintiff did not lodge a complaint about Phillips' actions and thus liability for that event could not be imputed to his employer. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015).

The bathroom incident is undoubtedly more outrageous, and one can assume that intentional exposure of genitalia *per se* qualifies as "severe" conduct for purposes of the third element in a hostile work environment claim. Even so, there is insufficient evidence to conclude that Hamlett's actions were "because of" Plaintiff's sex rather than an example of a juvenile game between coworkers that became regrettably escalated by a series of tit-for-tats. No reasonable juror could infer solely from that event that Hamlett is a homosexual, and Plaintiff's brief identified no other evidence that would support that conclusion or satisfy the other two modes of proof under *Oncale*. Moreover, Plaintiff admitted in his deposition that he did not report the incident to a supervisor or manager.

In sum, the corndog and bathroom incidents cannot be the basis of liability for a hostile

13

work environment.

**B.     Unwelcomeness**

Defendants next argue that there is no evidence that Trent's harassment was unwelcome. They base this argument mainly on the contention that Plaintiff "participated" in the hijinks—*e.g.*, reciprocating by calling Trent "Sherry" or "bitch" or "queer" or "gay" or "faggot," or talking about his sexual encounters with females. As they put it, Plaintiff "gave as much as he got." But aside from pointing out that harassment must be placed "in context," they point to no authority showing that participation in some name-calling or horseplay immunizes explicitly unwelcome conduct from liability.

Proving unwelcomeness "is not a high hurdle," *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018), and it is cleared in this case. All an employee has to do it voice his objection to the harasser or his employer. *Id*. at 328–29. Plaintiff was visibly upset when he complained to his superiors about Trent's open-fly-in-the-face stunt. The record amply demonstrates, as well, that Plaintiff complained to Kesler multiple times about Trent's conduct. Further, Plaintiff asked Trent to stop "humping" him. (Funk Dep. at 202–03). When Trent yanked Plaintiff's underwear, Plaintiff told him "don't ever do that again." (Funk Dep. at 226). Plaintiff also told Trent and others that Trent's comments about having oral sex with Plaintiff were "sexual harassment." (Funk Dep. at 216). These facts are legally sufficient to advance the issue to the jury.

**C.     Severe or Pervasive Harassment**

Defendants also contend that the Trent's harassment of Plaintiff was neither severe nor pervasive. A reasonable jury could conclude otherwise.

This element includes both a subjective and objection component. *EEOC v. Xerxes*

*Corp.*, 639 F.3d 658, 676 (4th Cir. 2011). There is no legitimate dispute that Plaintiff found the harassment subjectively severe or pervasive. "Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position. That determination is made by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015); *Strothers*, 2018 WL 3321317, at *8.

The circumstances here overwhelmingly favor a finding that Trent's harassment was severe *and* pervasive. Trent made physical contact with and gestures toward Plaintiff—*e.g.*, opening his fly, habitually humping Plaintiff, touching Plaintiff's underwear, placing his arm around Plaintiff—in a sexual manner. This was accompanied by Trent's frequent, graphic, hyper-sexualized remarks to and about Plaintiff in front of coworkers, over a period of months if not years. These remarks included expressly and impliedly propositioning Plaintiff for sex, bragging about homosexual encounters, asserting that Plaintiff and Trent were sexual partners, and referring to his penis as "Big Red." This was a far cry from what Defendants call "isolated incidents" of mere "boorishness." (Dkt. 30 at 36). This was severe and pervasive harassment. *E.g., Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (finding sexual comments and questions, sexual propositions, recounting of sexual escapades, and unwelcome touching presented "a strong claim for hostile work environment"); *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208–09 (4th Cir. 2014); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th

15

Cir. 2003).[4]

Defendants pick out particular examples of Trent's conduct and craft mitigating arguments about them—*e.g.*, Trent only pulled up Plaintiff's underwear, Plaintiff sometimes himself uttered inappropriate gay slurs, or Plaintiff didn't report every single example of harassment. (Dkt. 30 at 35). But a reasonable juror cannot ignore "all the circumstances" and fail to consider the totality of Trent's actions. *Boyer-Liberto*, 786 F.3d at 277.

### D.     Imputing Liability and the *Ellerth/Faragher* Defense

The last element of a hostile work environment claim requires proof that the harassment was imputable on some basis to the employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir. 2003). Harassment from a *coworker* requires a showing that the employer knew or should have known about the harassment and failed to stop it. Alternatively, harassment from a *supervisor* creates vicarious liability, unless the employer affirmatively proves it took reasonable steps to prevent harassment and the victim unreasonably failed to address the harassment. *Id*. at 334. Someone is a supervisor under Title VII "if he or she is empowered by the employer to take tangible employment actions against the victim." *Boyer-Liberto*, 786 F.3d at 278. "An employee so empowered is able to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*.[5]

---

[4]     Further, there is evidence that the harassment detrimentally affected Plaintiff—he sometimes left work early to avoid the harassment, he became visibly shaken when trying to report it, and he suffered stress and heightened blood pressure due to it.

[5]     The parties dispute whether the primary harasser, Trent, was Plaintiff's supervisor. Defendants say no, citing to Plaintiff's testimony. Plaintiff testified that Trent was an "hourly employee" but "was the lead person" or "senior person" in the K-Building with the title "senior material control inventory technician." (Funk Dep. at 163). He oversaw "day-to-day jobs you do" in K-Building. (*Id*.).

"Sexual harassment is imputable to an employer when the employer knew or should have known about the harassment and failed to take effective action to stop it." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015). Undoubtedly, Defendants took strong action once Plaintiff lodged his complaints higher up the hierarchy in May 2015—an investigation was initiated and completed within days, which resulted in the firing of both Trent and Kesler.

The problem, however, rests with Kesler's inaction. The record shows that Kesler was a supervisor. The record also shows that Plaintiff repeatedly complained to Kesler about Trent's actions, which Kesler himself observed. (*E.g.*, dkt. 39-1 at ECF 17–18; Funk Dep. at 199–200, 217–18). Equally clear is the fact that Kesler did absolutely nothing in response. Indeed, Kesler was terminated for that reason. These reports to and direct observations by a superior such as Kesler sufficed to put Defendants on notice of the harassment. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) ("Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment."); *id.* (finding knowledge where victim verbally complained to her supervisor about the harassment), 320 ("Evidence of repeated complaints to supervisors and managers creates a triable issue as to whether the employer had notice of the harassment."); *e.g.*, *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997) (finding triable issue of notice of harassment when specific complaints made to managers).

---

On the other hand, Plaintiff also made clear that it was *Kesler*, not Trent, who made promotional, pay, or disciplinary decisions. (Funk Dep. at 164–65). As coworker Lewis testified, Trent was just "somebody you'd report through to go to" Kesler; Trent "was just there, you know. Like he wanted to be more than what he was, but he was there." (Lewis Dep. at 24–25). Trent had no control over scheduling. (Lewis Dep. at 25).

Given the holding below that liability can be imputed under the negligence standard to Defendants based on the reports of harassment made to Kesler, the Court need not reach the issue of Trent's status.

Defendants assert that they should not be liable because Plaintiff failed to complain through the proper avenues prior to May 2015, according to their internal policy. This argument bleeds into the wrong analytical box: Whether a plaintiff took advantage of a complaint procedure is part of the *Ellerth/Faragher* affirmative defense to direct harassment *by* a supervisor, not the supervisor's (Kesler's) failure to act on harassment reported *to* him *by* others (to which the negligence standard applies).[6] And there can be no real dispute that Kesler was aware of Trent's harassment.

In sum, the evidence on causation is sufficient to go to the jury.

## V. Retaliation

Plaintiff also advances a retaliation claim. Retaliation requires that (1) Plaintiff engaged in protected activity (here, reporting the harassment), (2) the employer took adverse action against him, and (3) a causal relationship. *Foster*, 787 F.3d at 250. If this is shown, the employer can escape liability by advancing a legitimate, non-pretextual reason for the adverse action. *Id*. Moreover, retaliatory actions have to be "materially adverse—such that they might have dissuaded a reasonable worker from engaging in protected activity." *Strothers*, 895 F.3d at 327.

The retaliatory actions Plaintiff complains of are as follows: (1) other employees called

---

[6] Moreover, the "mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011). The record supports the inference that sexual harassment training for employees was sporadic or even nonexistent. (Burch Dep. at 36, 38; Lemon Dep. at 49; Trent Dep. at 98–99; Brummett Dep. at 31, 33; Angel Dep. at 43–44). The evidence also supports the inference that employees, including Plaintiff, did not have access to the policy or did not know how they could gain access to it. (Spraker Dep. at 42, 45–46; 30(b)(6) Dep. at 23–24. And Plaintiff indicated he was unaware of the harassment reporting policy, and he did not know how to use a computer, owing to the fact he had no cell phone or computer of his own and was not required to use one for his job. (Funk Dep. at 115–16, 118, 359–60)

him names (*e.g.*, tattletale, rat, snitch) after Trent and others were fired, or harbored resentment towards him; (2) his car was booted in the company parking lot; (3) his referral to counseling; (4) his being required to undergo a security clearance review; and (5) his being transferred to another building temporarily.

The namecalling by coworkers is nonactionable: "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Sunbelt Rentals*, 521 F.3d at 315. Plaintiff has been unable to identify who teased him and, when confronted with the contention that he did not report any specifics to investigate or correct the behavior, attempted to shift the blame on Defendants for not asking. (Dkt. 39 at 49).

As for the temporary building transfer, it too was not materially adverse because Plaintiff continued to work and lost no wages or benefits as a result of it. (Funk Dep. at 312). And Plaintiff admitted that the booting of his vehicle was justified on nonretailatory grounds: The first time his handicap sticker had expired, and the second time he failed to display the new, valid sticker. (Funk Dep. at 153–58).

Regarding Plaintiff's security clearance review and referral to counseling, Defendants had legitimate reasons for those actions that had nothing to do with his complaints: The record is replete with evidence—known to Defendants as a result of their investigation—that Plaintiff had stress and anger management issues, himself used inappropriate language at times, and even once vowed to kill someone. Even if that evidence turned out to be mistaken, Plaintiff's employer was entitled to "honestly believe[]" that Plaintiff had anger issues and thus warranted treatment and extra security scrutiny. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217–18

(4th Cir. 2007).[7] Moreover, Plaintiff admitted that he "was doing good with" counseling and was happy, thus indicating it was not a materially adverse employment action. (Funk Dep. at 271).

## SUMMARY

Based on the foregoing, the motion for summary judgment will be granted in part and denied in part. The retaliation claim will be dismissed, but the hostile work environment claim will proceed to trial. An appropriate order will issue, and the Clerk is directed to send a copy of this opinion and the order to counsel.

Entered this  22nd  day of August, 2018.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[7] Plaintiff argues that the security rationale does not hold water because in Feburary 2016 a "Special Agent for Federal Investigations" needed to conduct a follow-up interview about Plaintiff's security clearance. This is not evidence of a dastardly plot but merely administrative and investigative follow up. Moreover, the nine-month lag time between Plaintiff's complaints and this follow-up interview negate any inference of causation. *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 99 (4th Cir. 2016) (compiling cases); *Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006).